IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MAX P. KITCHEN,

      Petitioner,

v.                            Case No. 2:10-cv-01264

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

**PROPOSED FINDINGS AND RECOMMENDATION**

On October 27, 2010, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 3). Pending before the court is Respondent's Motion for Summary Judgment (ECF No. 15). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

On December 17, 2010, in accordance with the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the undersigned entered an Order advising Petitioner of his right to file a response to any Motion for Summary Judgment filed by Respondent. (ECF No. 13). Respondent filed his Motion for Summary Judgment (ECF No. 15) and a Memorandum of Law in support thereof (ECF No. 16) on January 24, 2011. On February 23, 2011, Petitioner filed an

Answer to Respondent's Motion for Summary Judgment (hereinafter "Petitioner's Response") (ECF No. 17). Respondent did not file a Reply. This matter is ripe for determination.

## STATE COURT PROCEEDINGS

### A.  Petitioner's criminal proceedings.

During the January 1994 term, Petitioner was indicted by a Logan County Grand Jury on one count of First Degree Murder (Count I), one count of Malicious Assault (Count II), one count of Conspiracy to Commit Murder in the First Degree (Count III), and one count of Conspiracy to Commit Malicious Assault (Count IV) (ECF No. 15, Ex. 1). Petitioner was represented in his criminal proceedings by Logan County Assistant Public Defender Kelly Codispoti.[1]

On June 6, 1996, following a jury trial, Petitioner was convicted of one count of First Degree Murder (Count I), without a recommendation of mercy, and one count of Conspiracy to Commit Malicious Assault (Count IV). Petitioner was found not guilty of Malicious Assault (Count II). At the close of its case in chief, the State elected not to go forward with the Conspiracy charge in Count III, so the trial court dismissed that count with prejudice. (Id., Ex. 2). The trial testimony will be summarized separately below.

---

[1]  Throughout his petition, Petitioner spells his counsel's name "Codispotti." The correct spelling of Petitioner's counsel's name is "Codispoti."

On January 30, 1997, Ms. Codispoti filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting the following grounds for relief:

1. The trial court erred by allowing into evidence a baseball bat that was not the baseball bat that was allegedly used at the time of the crimes.

2. The trial court erred by allowing into evidence testimony of other crimes.

3. The trial court erred by allowing into evidence the co-defendant's specific plea to some of the charges for which the petitioner stood accused and the specific plea to charges of which the Defendant was not charged.

4. The trial court erred by giving improper cautionary instructions

5. The trial court erred by allowing the State to lead his witnesses.

6. The trial court erred by failing to direct a verdict of acquittal for the petitioner at the close of the State's case-in-chief and at the close of all evidence in the case.

7. The trial court erred by failing to give Defendant's instructions.

8. The trial court erred by giving State's Instructions over the objection of the petitioner.

9. The trial court erred by failing to allow the jury to consider possible verdicts of lesser included offenses of voluntary manslaughter and involuntary manslaughter.

10. The trial court erred by failing to dismiss for cause a juror whose relative had been murdered.

11. The trial court erred by failing to dismiss for cause a juror whose nephew by marriage was the investigator for the prosecutor's office, was active in the investigation of petitioner's case,

and was present at the prosecutor's table throughout the trial.

12.  The trial court erred by failing to dismiss for cause a juror who was a friend and next-door neighbor of the prosecutor.

(Id., Ex. 4).   The SCAWV refused the Petition for Appeal on September 3, 1997.  (Id.)

**B.  Petitioner's habeas corpus proceedings.**

On August 27, 1998, Petitioner, by new counsel, Matthew L. Clark, filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Logan County (Case No. 98-C-285), raising the following grounds for relief:

1.  The trial court erred in its evidentiary rulings in violation of Petitioner's state and federal constitutional rights, under Amendments V, and VI of the United States Constitution, and Article III, Sections 10 and 14 of the West Virginia Constitution.

2.  The excessive use of uncharged misconduct evidence denied Petitioner a fair trial and due process of law to which he was constitutionally entitled under United States Constitutional Amendments V and XIV, and West Virginia Constitution, Article III, Section 10.

3.  The improper cautionary instructions given to Petitioner's jury denied him the protections separately and independently provided for by State and Federal constitutions.   United States Constitutional Amendments V, VI, and XIV; West Virginia Constitution, Article III, Sections 10 and 14.

4.  The state's instructions given over objection of Petitioner's trial counsel, deprived him of his constitutional rights under the United States Constitutional Amendments V, VI, and XIV, and West Virginia Constitution, Article III, Sections 10 and

4

14.

5.    The evidence was insufficient to support the jury verdict.

6.    The improper closing argument by the state denied Petitioner a fair trial in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and Article III, Section 10 of the West Virginia Constitution.

7.    The Petitioner's confrontation clause rights were violated under both the federal and state constitutions.

8.    The trial court abused its discretion when it admitted prejudicial hearsay evidence, which violated Petitioner's [rights under the] confrontation clauses of the Sixth Amendment of the United States Constitution and Article III, Section 14 of the West Virginia Constitution.

9.    The Petitioner was denied his constitutional right to have the jury instructed on his theory of defense, in violation of both of his state and federal constitutions. United States Constitutional Amendments V, VI, and XIV, and Article III, Section 14 of the West Virginia Constitution.

10.    The Petitioner was denied the effective assistance of trial counsel, in violation of both the Sixth Amendment to the United States Constitution, and Article III, Section 14 of the West Virginia Constitution.

11.    Petitioner was deprived of his federal and state constitutional rights to effective assistance of appellate counsel on his direct appeal as guaranteed by United States Constitutional Amendment VI, and West Virginia Constitution, Article III, Section 14.

12.    The cumulative effect of the numerous errors mandate reversal of the Petitioner's conviction.

(Id., Ex. 5). Following an evidentiary hearing held on September

9, 2001 (id, Ex. 17), the Circuit Court denied Petitioner's habeas

5

corpus petition in a Final Order entered on January 2, 2003. (<u>Id.</u>, Ex. 6).

On August 20, 2003, Petitioner, by new counsel, Carrie L. Webster, filed a Petition for Appeal from the denial of Petitioner's Circuit Court habeas corpus petition. (<u>Id.</u>, Ex. 7). The Petition for Appeal asserted the following grounds for relief:

A.   The lower tribunal erred when it concluded that the performance of Kitchen's trial counsel at critical stages of the proceedings did not fall below that of a reasonable criminal defense attorney because counsel's collective failure to develop a credible and consistent defense of trial strategy, give an opening statement, call crucial witnesses or otherwise attempt to mitigate his sentence resulted in his wrongful conviction of first degree murder.

B.   The lower tribunal's decision that the trial court properly allowed the State to introduce collateral evidence of prior uncharged misconduct against Kitchen without conducting an in camera hearing and making evidentiary findings required by <u>State v. McGinnis</u> and W.V.R.E. 404(b), impugned fundamental fairness and denied Kitchen due process and a fair trial in contravention of his constitutional rights.

C.   The lower tribunal erred in ruling that the circuit court acted properly when it permitted the State to introduce the co-defendant's guilty plea to crimes that Kitchen was not charged with committing and gave a confusing jury instruction.

D.   The lower tribunal improperly ruled that the trial court did not commit reversible error by not instructing the jury to disregard the prosecutor's prejudicial and misleading remarks in closing argument which referred to the uncharged misconduct of Kitchen as a "felony" and to him as "guilty."

E.   The lower tribunal erred when it ruled that the trial court did not err in failing to disqualify for cause a juror who was a friend and next door

6

> > neighbor to the prosecutor and another juror whose nephew by marriage was an investigator for the prosecutor's office, was active in the investigation of this case and present at the prosecutor's table during the trial.

> F.   The lower tribunal erred when it ruled that any errors committed during Kitchen's trial were harmless when cumulative errors deprived Kitchen of his constitution[al] rights to a fair trial under the state and federal constitution.

(Id.)  On August 20, 2003, Ms. Webster also filed a Motion to Supplement the Record with materials that had not been available either in Petitioner's criminal proceedings, or his Circuit Court habeas corpus proceedings.

On October 9, 2003, the SCAWV granted Petitioner's Motion to Supplement the Record and remanded the case to the Circuit Court of Logan County with directions to consider the material, and to enter a new Final Order disposing of all claims raised in Case No. 98-C-285.  (# 15, Ex. 7 at 1).

On August 24, 2005, an omnibus habeas corpus hearing was conducted before the Honorable Irene C. Berger, Kanawha County Circuit Judge, sitting by special assignment.  (Id., Ex. 18).  By Order entered August 29, 2007, Judge Berger addressed the merits of Petitioner's claims and denied his Petition for a Writ of Habeas Corpus.  (Id., Ex. 8).

On June 6, 2008, Petitioner, by counsel, Ms. Webster, filed a Petition for Appeal from the denial of his habeas corpus petition, asserting the following grounds for relief:

I.   The lower court erred by concluding that Kitchen's counsel was not ineffective despite its finding that counsel's deficient trial performance resulted from her failure to request a bifurcated trial, introduce mitigating evidence or to plea for mercy on behalf of a client who was sentenced to life in prison after a jury convicted him of first degree murder without a recommendation of mercy.

II.  The lower court erred in denying Kitchen's habeas claim that his Constitutional right to due process and a fair trial were violated by ruling that the trial court acted properly when it allowed the introduction of the co-defendant's guilty plea and other Rule 404(b) evidence of prior uncharged misconduct against Kitchen and by finding that the trial court properly conducted an *in camera* hearing prior to its admission and gave appropriate limiting instructions.

III. The lower court erred by failing to make findings regarding the trial court's failure to instruct the jury on misleading and prejudicial remarks made by the prosecutor in closing argument and by ruling that those remarks were not improper.

IV.  The lower court erred by ruling that the trial court's refusal to disqualify two jurors with strong ties to the prosecutor was proper and constitutionally permissible.

V.   The lower court erred in denying Kitchen's claim that his constitutional right to a fair trial had been violated by ruling that any cumulative effect of failures committed during his trial did not result in ineffective assistance of counsel or prejudice to him.

(Id., Ex. 9). On November 12, 2008, the SCAWV granted the Petition for Appeal. (Id.)

On June 7, 2010, the SCAWV issued an opinion affirming the findings of the Circuit Court. State ex rel. Kitchen v. Painter, 700 S.E.2d 489 (W. Va. 2010). Petitioner subsequently filed a

Petition for Rehearing, which was denied by the SCAWV on September 22, 2010.  (# 15, Ex. 11).  The SCAWV entered a final order affirming the rulings of the Circuit Court on September 30, 2010. (Id., Ex. 12).

**C.  Petitioner's section 2254 petition.**

On October 27, 2010, Petitioner, proceeding pro se, filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  The petition raises the following grounds for relief:

1.  Petitioner received ineffective assistance of trial and appellate counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article III, Section 14 of the West Virginia Constitution and the lower court's ruling to deny habeas relief is contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained in the record of the proceedings.

2.  Fundamental fairness in the trial court proceeding was impugned when the lower court allowed the introduction of the co-defendant's guilty plea and other Rule 404(b) evidence of prior uncharged misconduct against the Petitioner and the lower court's decision on this issue is contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained in the record of the proceedings.

3.  The State's prosecuting attorney committed prosecutorial misconduct in obtaining a conviction based on misleading and prejudicial remarks in closing argument, [and] the lower court's ruling was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained

9

in the record of the proceedings.

4.   Petitioner's right to a fair and impartial jury was contravened when the lower court refused to disqualify two jurors with strong ties to the prosecutor and the courts' rulings to deny Petitioner habeas relief was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained in the record of the proceedings.

5.   Petitioner's guarantee[] to due process was violated by the cumulative effect of state trial errors and the lower court's decision to deny habeas relief was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained in the record of the proceedings.

6.   Petitioner's Sixth Amendment rights to an impartial jury and effective assistance of counsel and Fourteenth Amendment rights to a fair trial were violated by West Virginia's trial procedure in failing to instruct the juries on what factors to consider when deliberating whether to recommend mercy in first degree murder cases.  The lower courts' rulings on the same are contrary to or an unreasonable application of clearly established federal law as announced by the United States Constitution and/or an unreasonable determination of the facts as set forth in the record of the proceedings.

7.   There was insufficient evidence presented to convict and sentence Petitioner on charges of first degree murder and the courts' rulings to deny Petitioner habeas relief was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court or was based on an erroneous determination of the facts as contained in the record of the proceedings.

>    8.   The trial court's instruction to the jury that
>    malice might be inferred by the use of a deadly
>    weapon impermissibly shifted the burden of proof to
>    Petitioner and the courts' rulings to deny
>    Petitioner habeas relief was [sic; were] contrary
>    to and/or an unreasonable application of clearly
>    established federal law as announced by the United
>    States Supreme Court or was based on an erroneous
>    determination of the facts as contained in the
>    record of the proceedings.

(ECF No. 3).

## **STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal Law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the

Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.   The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.   Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.   See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).   Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## **TRIAL TESTIMONY**

In the early evening hours of October 1, 1995, Carl Starkey (hereinafter "Starkey") and Andrew Caldwell (hereinafter "Caldwell") were riding a four-wheeler in Dehue Hollow in Logan County, West Virginia. (ECF No. 15, Ex. 13 at 76). Starkey was driving. The road that Starkey and Caldwell took into the hollow ran past Tommy Miller's house, where Petitioner, Brian Lambert, Rodney Nelson, Jake White, and Petitioner's co-defendant, James Hank Mosley (hereinafter "Mosley") were drinking beer. (Id., Ex. 14 at 131, 162, 189; Ex. 15 at 7, 42).

Mosley testified that, when Starkey and Caldwell drove by, he and Petitioner started "talking about whipping their ass for stealing our weed." (Id., Ex. 15 at 43). Mosley verified that he and Petitioner were growing marijuana in Dehue Hollow. (Id. at 43-44).

Brian Lambert also testified that, after Starkey and Caldwell drove by, Petitioner and Mosley said they were going to beat up Starkey. (Id., Ex. 14 at 132). Rodney Nelson testified that Mosley said "we should just go get them now." (Id. at 163).

After Starkey and Caldwell drove by, the group started up the road on foot. Petitioner and Mosley stopped by their adjoining residences and retrieved two aluminum baseball bats. (Id., Ex. 14 at 164, 191; Ex. 15 at 10, 45). The rest of the group proceeded further up the road, while Mosley went to lock the gate leading out

13

of the hollow. (<u>Id.</u>, Ex. 15 at 46). Mosley testified that he locked the gate so that Starkey and Caldwell would be forced to take a different path along a creek bed, where Petitioner and Mosley would be hiding. (<u>Id.</u> at 49). Mosley and Petitioner told the others to "scatter so they wouldn't be involved." (<u>Id.</u>, Ex. 14 at 208). Then, he and Petitioner hid on opposite sides of the path. (<u>Id.</u>, Ex. 15 at 52). The other men continued to drink nearby.

When Starkey saw the locked gate, he turned the four-wheeler down onto the path where Mosley and Petitioner were hiding. (<u>Id.</u>, Ex. 14 at 169-170). Petitioner and Mosley jumped out and used the baseball bats to knock Starkey and Caldwell off of the moving four-wheeler. Starkey testified that Mosley and Petitioner "said we just stole their pot" and a fight ensued. (<u>Id.</u>, Ex. 14 at 82, 87; Ex. 15 at 53-54). Mosley attacked Starkey and Petitioner attacked Caldwell. (<u>Id.</u>, Ex. 14 at 82-83). Brian Lambert testified that he saw Caldwell on his knees with one hand held out and Petitioner bringing the bat away from Caldwell's arm. (<u>Id.</u> at 137-141). Rodney Nelson testified: "I turned around and I seen [Caldwell] in the water on his knees, and he like raised up and I seen [Petitioner] hit him." (<u>Id.</u> at 172). Nelson said that Petitioner struck Caldwell in the head. (<u>Id.</u> at 173). Thomas Miller also testified that he saw Petitioner hit Caldwell with the bat, but did not say where on his body Caldwell was struck. (<u>Id.</u> at 137-40).

After the first blow, Caldwell went down on his knees and tried to protect himself by holding out his arms. Petitioner apparently struck Caldwell two more times in the head, sending him to his hands and knees and then face down in the creek where he lay "bubbling in the water." (Id., Ex. 14 at 117, 141, 172-173, 177, 198-204). Jake White testified that he had moved down by a telephone pole and that he heard disturbing sounds of thuds and pings apparently made by the bat as Petitioner struck Caldwell's skull, and saw Petitioner standing over Caldwell with the bat. (Id., Ex. 15 at 15, 21). Nelson, Miller, White and Mosley all testified to hearing Petitioner tell Caldwell to "lay down" or "stay down." (Id., Ex. 14 at 173-174, 198-201; Ex. 15 at 15-16, 56). White also heard Miller yell "Oh God."

At some point, Starkey, who had been struck by Mosley, fell unconscious. When Starkey came to, Caldwell was in the creek. Before fleeing with the other witnesses, Thomas Miller helped Starkey pull Caldwell out of the water and up onto the creek bank. (Id. at 100, 204-205).

Starkey went to a house down the path to summon help, and both he and Caldwell were taken to the hospital. Caldwell died five days later, on October 6, 1995. (Id. at 49).

The coroner testified that Caldwell died of multiple blunt force injuries to the head. (Id. at 114). Caldwell's skull displayed evidence of blows to the top of the right eyebrow, above

15

the right ear, and the back of his head. (<u>Id.</u>). The coroner also testified that fractures radiated from behind Caldwell's ear to the base of his skull. (<u>Id.</u> at 115). He stated that, because of the nature of head injuries, the site of the trauma can often be on the opposite side of the point of impact, which appeared to be the case with Caldwell's injuries. The blows to Caldwell's head further created "linear" fractures, two of which originated above Caldwell's eyes and joined together and extended into his nose. Caldwell also displayed a defensive wound on his upper left arm. (<u>Id.</u>, Ex. 14 at 116-118). Because of the nature and severity of the injuries, the coroner could not state which of the major blows was fatal.

Approximately three days before Petitioner's trial, his co-defendant, Hank Mosley, entered into a plea agreement in exchange for testifying against Petitioner. Mosley pled guilty to the malicious assault of Carl Starkey, conspiracy to commit malicious assault, and cultivation of marijuana (which had not been charged in the indictment, but was brought by way of an information). (<u>Id.</u>, Ex. 15 at 48). He was sentenced to serve four to twenty years. (<u>Id.</u> at 72).

In addition to testifying that they were growing marijuana in Dehue Hollow, and the details of the attack provided above, Mosley testified that the attack was unprovoked and that he never saw the victims with a weapon. (<u>Id.</u>, Ex. 15 at 61, 79). However, on

cross-examination, Mosley stated that he was concerned that the victims were armed.  (Id. at 67-68).

On cross-examination, Mosley testified that some other people had previously told him that Starkey was stealing their marijuana. (Id. at 66-67).  Mosley also testified that, after he talked about "whipping Carl Starkey's ass," Petitioner suggested to him that they should call the police about Starkey and Caldwell going up there.  (Id. at 64).  Mosley further stated that, near the conclusion of the altercation, Petitioner tapped him on the shoulder and said that Starkey had "had enough." (Id. at 68-69). Mosley further testified that Petitioner told him that he struck Caldwell in the back, not the head.  (Id. at 70).  Mosley further acknowledged that he told someone that Tommy Miller was stomping on Caldwell's head.  He denied saying the same about Jake White. (Id. at 71).

On re-direct, Mosley told the jury that he lied about Miller stomping on Caldwell's head, in order to "find a way out." (Id. at 75-76).  He testified that no one other than he and Petitioner did anything with regard to striking either victim.  (Id. at 76-77, 79).  Mosley confirmed that Miller helped him pull Caldwell out of the creek at the end of the altercation, before they all left the hollow.  (Id. at 80).

Petitioner elected not to testify.  However his counsel called two witnesses, who testified that they had discussions with

eyewitness Jake White, who told them about the incident and said they were going to "put all the blame on [Petitioner.]" (Id., Ex. 15 at 97, 104).   One of the witnesses, Shawn Carter, stated that White told him he had burned the clothes and shoes he had been wearing that night.   This testimony was used to support Ms. Codispoti's theory that someone other than Petitioner had stomped on Caldwell's head, and that such action could have been the fatal blow leading to Caldwell's death.

### TESTIMONY AT OMNIBUS HEARINGS

Two evidentiary hearings were conducted in Petitioner's state habeas corpus matter.   At the first hearing, the prosecuting attorney, Jerry White, was called to testify about a plea offer that was made to Petitioner before trial.   Mr. White's recollection was that the plea offer, which Petitioner rejected, included a guilty plea to first degree murder with mercy.   (ECF No. 15, Ex. 17 at 9).   Mr. White also testified about his recollection of the eyewitness testimony with regard to Petitioner being the perpetrator of the assault on Caldwell.   (Id. at 11-12).

Ms. Codispoti testified at both evidentiary hearings.   Because of the passage of time, Ms. Codispoti could not recall many details concerning her representation of Petitioner in his trial and appellate proceedings.   However, she did testify about her recollection of her investigation of Petitioner's case, her decision not to call character witnesses, her decision not to give

an opening statement, and other aspects of her trial strategy.  Ms. Codispoti was also questioned about her decisions concerning what issues to raise in Petitioner's direct appeal.

Petitioner also testified at both hearings.  At the second hearing, following the remand by the SCAWV, Petitioner also presented the testimony of his mother, Nell Brown, who stated that she was not subpoenaed as a witness, nor did trial counsel or the investigator ever talk to her or other family members about Petitioner's family background and relationships.  (ECF No. 15, Ex. 18 at 44-59).  Petitioner also presented the expert witness testimony of Charleston, West Virginia defense attorney Gregory Campbell.  (Id. at 91-157).  The testimony of these witnesses will be discussed in greater detail, *infra*, as necessary.

## ANALYSIS

### A.   Ground One - Ineffective assistance of counsel claims.

In Ground One of his section 2254 petition, Petitioner has asserted numerous claims of ineffective assistance of counsel by his trial and appellate counsel, Kelly Codispoti.  In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

19

have been different.  Id. at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  Id. at 689. Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, id. at 689, and the burden is on the Petitioner to show prejudice.  Hutchins v. Garrison, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Strickland, 466 U.S. at 690. A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  See Strickland, 466 U.S. at 693.  Using this standard, the undersigned will address each of Petitioner's claims of ineffective assistance of counsel.

Failure to present mitigating evidence or argue for mercy

Petitioner's first claim of ineffective assistance by his trial counsel is that she failed to present mitigating evidence which could have swayed the jury to recommend mercy on his life sentence.  Petitioner's petition asserts that "[t]he deficiency of

20

trial counsel's performance and resulting prejudice to Petitioner is apparent from a close analysis of not only the trial transcript but also from testimony taken at two separate evidentiary hearings." (ECF No. 3 at 10).  The petition further asserts:

First, trial counsel willingly assumed the responsibility as lead counsel in Petitioner's first degree murder trial and consequently knew her client faced a potential life prison sentence without the possibility of parole.  Therefore, trial counsel had a duty under the law to mitigate Petitioner's potential sentence with available evidence, but failed to do so.

Upon counsel's repeated advice, Petitioner did not testify in his own defense. (First Omnibus Habeas Corpus Hearing, Transcript page 42, hereinafter 1st Omn. Hrg. Tr. p. ___; Second Omnibus Habeas Corpus Hearing, Transcript pages 28, 88, hereinafter 2nd Omn. Hrg. Tr. pp. ___.)  Even though trial counsel advised her client not to testify, she, nonetheless, had other available evidence to introduce in order to provide the jury with a favorable impression of Petitioner as a son, father and friend, or, at least, reduce the jury's view of the severity of his alleged acts.  Instead, counsel waived her opening statement, refused to call a single character witness and failed to develop or articulate a cogent theory of defense.  Consequently, the jury did not recommend mercy nor a lesser offense.

The lack of a consistent defense or trial strategy, the lack of an opening argument, the failure to present witnesses who could have bolstered Petitioner's character or consider trial bifurcation, and the overall lack of effective legal representation at critical levels of the trial proceedings deeply prejudiced his right to a fair trial on the issue of mercy and raised a reasonable probability that, but for counsel's deficiencies, the results of the proceedings would have been different and Petitioner would not have received a sentence of life without mercy.

(Id. at 10-11).  Petitioner further discusses Ms. Codispoti's trial conduct as follows:

21

> Trial counsel testified that she did not offer character evidence because she was concerned about the "marijuana issue." Counsel also testified about her vague recollection about a previous ball bat altercation involving Petitioner. Petitioner would urge the Court, however, to view that testimony as being highly unreliable, disputed and inconsistent with her testimony during her first evidentiary hearing. (2nd Omn. Hrg. Tr., pp. 16, 67-68.)

(ECF NO. 3 at 18).

In support of his ineffective assistance of counsel claims, Petitioner presented the expert witness testimony of Charleston, West Virginia criminal defense attorney Gregory Campbell. Mr. Campbell testified that, in his opinion, multiple errors committed by Ms. Codispoti likely impacted the outcome of Petitioner's trial. Mr. Campbell stated that "you need to put on mitigation evidence." (ECF No. 15, Ex. 18 at 107).

In this case, Mr. Campbell believed that a reasonable defense counsel should have asked the judge to allow her to develop character evidence limited to the fact that Petitioner was employed, had no prior criminal record and was raising a child. Mr. Campbell further testified that, despite the "marijuana issue," because Petitioner's trial was a unitary trial, they only had "one shot to get in mitigation evidence, and you had to get it in to save him . . . ." (Id. at 109). Mr. Campbell further testified that bifurcation could have been a viable option in order to introduce valuable mitigation evidence to the jury. (Id. at 114).

Petitioner's petition further asserts that Ms. Codispoti's own testimony during the omnibus evidentiary hearings demonstrates that she could have called certain character witnesses, but "chose not to for unexplained and unacceptable reasons." (ECF No. 3 at 14). Petitioner's petition further states:

> At the close of the state's evidence, it would have been obvious to any reasonable and knowledgeable criminal defense attorney that the testimony of the men with Petitioner on the night in question could result in his conviction for first degree murder, unless trial counsel could prevent [sic; present] evidence to support her theory that "he didn't do it" or that he acted in self-defense. Yet, other than two quick rebuttal witnesses, counsel offered no evidence at all to support her theory. In fact, these witnesses did nothing to support her theory. Rather, they merely suggested that others may have been involved in the incident by suggesting they intended to "pin it on [Petitioner]."
>
> Ms. Codispoti failed to realize that it was crucial that character witnesses be called to help mitigate Petitioner's sentence in the event he was convicted of either crime. In fact, Greg Campbell agreed that due to the Rule 404(b) evidence that had already come in about marijuana (See Issue II, *infra*), there already existed an inference that Petitioner was growing and/or smoking it. (1st Omn. Hr. Tr., p. 108.)

(Id. at 14). Petitioner's petition also addresses Ms. Codipoti's failure to move to bifurcate his trial, stating:

> Ms. Codispoti likewise acknowledged that she did not move to bifurcate and did not consider it prior to trial because she did not believe it was necessary. (2nd Omn. Hrg. Tr., pp. 20.) She suggests that had she known what she learned before the plea of co-defendant Mosley (information which she does not even recall), she would have considered doing so. However, even if she actually learned something damaging about Petitioner, she would have had ample time, prior to trial, to move to bifurcate the sentencing phase.

(Id. at 18).

As discussed by Respondent in his Memorandum of Law, Ms. Codispoti testified at both of the omnibus evidentiary hearings. In the first hearing, Ms. Codispoti stated that she discussed with Petitioner whether to put his character into issue for purposes of mitigation, but as a matter of strategy, they decided against it. (ECF No. 15, Ex. 17 at 37-38). During the second hearing, Ms. Codispoti elaborated on her concerns about calling character witnesses as follows:

> Q.  And you also testified in a previous hearing, if you'll recall, that one of your concerns in not calling certain character witnesses was what you referred to as the marijuana issue.  Do you recall that?
>
> A.  That's correct.
>
> Q.  And I think you further elaborated that some concern was that either it would come out that he was smoking pot and/or selling pot to friends. Would that be your recollection?
>
> A.  Well, there's more to that than just that, I think. But, I don't -- if I recall, certain witnesses would not only have testified about him smoking pot in the past, certain witnesses would also have talked about him growing pot in the past, certain witnesses would have also talked about some altercation that he had gotten into involving a ball bat in the past.   I don't know which witnesses.   This is a vague recollection, but I know there were witnesses that he had brought, you know, and told me to look into that would be good character witnesses for him that ended up not being such good character witnesses.

(Id., Ex. 18 at 16-17).  Ms. Codispoti further testified that Petitioner's failure to be forthcoming and the guilty plea entered

into by his co-defendant substantially affected the direction of
her defense strategy:

> A.   Well, let me just explain to you, if I may.  Mr.
>      Kitchen had no prior criminal record.  If he did,
>      it might have been a traffic violation or something
>      like that.    He, he had some good character
>      witnesses.  Mr. Kitchen from the git-go, was not
>      forthcoming with trial counsel; and he, he himself
>      may have -- I could tell he wasn't forthcoming with
>      me, and I stressed from day one how important it
>      was for him to tell me the truth so that we could
>      properly prepare a defense.  We had prepared a
>      defense that would have had substantial character
>      evidence, but Mr. Kitchen two days before -- or
>      whenever the plea from his co-defendant came
>      through was when the ultimate factors came out.
>      That's when he finally told me exactly what I
>      needed to know to properly defend him.

(Id. at 15-16).

Concerning bifurcation, Ms. Codipoti testified as follows:

> Q.   Did you ever as part of your trial strategy, given
>      the concerns that you had prior to and during
>      trial, consider moving to bifurcate so you could
>      get that --
>
> A.   (interposing) I would have if I had known what I
>      knew before the plea of his -- the co-defendant.
>      If Mr. Kitchen had been forthcoming with me before
>      the plea of his co-defendant, I would have
>      considered the bifurcation.  I didn't really think
>      it was necessary because this stuff about these
>      other witnesses, what they could testify, came from
>      him; and what would happen if the character, if we
>      put his character into issue came from him.
>
>      This was not stuff that I had developed through the
>      witnesses.  It was stuff that -- I mean, these
>      witnesses hadn't come forward and told me this
>      until Mr. Kitchen made me aware that this is what
>      these witnesses could, could say.  I mean, I don't
>      think John Doe off the street is going to say to
>      you, "Hey, you know, Max and I sat down many nights
>      and smoked marijuana."  He's not going to tell you

25

> that; and even though I may have inquired of him if
> there was anything that he knew negative about
> Max's character, that -- and when I refer to "him,"
> I'm just saying "him" because there were males and
> females.

(ECF No. 15, Ex. 18 at 20-21).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment cites to the SCAWV's opinion affirming the Circuit Court's denial of habeas corpus relief to Petitioner.  The opinion states in pertinent part:

> Significantly, the appellant has referred this Court
> to no evidence of record indicating what kind of father
> the appellant was to his young daughter. As suggested by
> the State in its brief, the fact that the appellant
> cultivated marijuana and endangered his relationship with
> his daughter by killing a person does not speak highly of
> the appellant as a parent and provides ample rebuttal
> evidence to the State.  In his brief to this Court, the
> appellant alludes to several friends and family members
> who he says would have provided favorable character
> testimony on his behalf.  Trial counsel testified below,
> however, that many of the appellant's friends would not
> have been effective character witnesses because they had
> used marijuana with the appellant.  With regard to the
> potential testimony of the appellant's family members,
> other than the appellant's mother, the appellant did not
> make a record through proffered testimony or affidavits
> as to the substance of family member testimony.  Absent
> such evidence, this Court is unable to determine whether
> or to what extent the testimony of these potential
> witnesses would have been helpful to the appellant.

> With regard to the appellant's mother's testimony,
> generally when character witnesses are family members or
> friends, their credibility is more likely to be
> questioned given their relationship with the defendant.
> See Com. v. Hoffman, 403 Pa. Super. 530, 589 A.2d 737,
> 746 (Pa. Super. 1991)(finding that counsel was not
> ineffective in failing to call a friend of the accused
> given that the witness's credibility would have been
> seriously questioned).  For this reason, we believe that
> the weight accorded the testimony of the appellant's

mother would have been limited.

In addition, courts have found that the decision to call witnesses during a trial is a tactical one. See Goodson v. United States, 564 F.2d 1071, 1072 (1977)(referring to counsel's decision not to interview or call a witness is a "tactical decision."). This Court has held:

> Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.

Syllabus Point 21, State v. Thomas, 157 W. Va. 640, 203 S.E.2d 445 (1974).

> The appellant's trial counsel testified below that the appellant was less than forthcoming with her prior to trial and, consequently, she feared potentially damaging rebuttal testimony if she introduced character evidence. Based on the foregoing considerations, this Court is unable to conclude that no reasonably qualified defense attorney would have acted as trial counsel in deciding not to call character witnesses on behalf of the appellant. [Footnote omitted].

State ex rel. Kitchen v. Painter, 700 S.E.2d 489, 501 (W. Va. 2010)

Respondent's Memorandum also cites to relevant United States Supreme Court and other federal precedent on this issue. The Memorandum states:

> In Darden v. Wainwright, 477 U.S. 168, 184 (1986), the United States Supreme Court evaluated a claim that counsel was ineffective for failing to put on mitigating evidence at a capital sentencing hearing. In Burger v. Kemp, 483 U.S. 776, 788 (1987), the Court examined a challenge to counsel's decision at a capital sentencing hearing not to offer any evidence during a sentencing proceeding.

27

The Court found in both instances that the decision whether or not to put on mitigating evidence was a matter of trial strategy because of the potential for damaging rebuttal evidence which the Ninth Circuit likened to a "basket of cobras." <u>Gerlaugh v. Stewart</u>, 129 F.3d 1027, 1035 (9th Cir. 1997). Although the <u>Darden-Burger</u> court dealt with mitigating evidence of severe psychiatric disturbances that had the potential to support a more severe sentence[] rather than to mitigate the crime, both courts addressed the issue purely as a matter of trial strategy.

Petitioner disregards the standards governing this claim and rather argues that trial counsel's decision not to present mitigating evidence was facially ineffective and presumptively prejudicial. However, it has never been held by the federal courts that mitigation is mandatory in a murder case. "[N]either the Supreme Court nor this court have ever held that it is <u>per se</u> ineffective assistance of counsel not to introduce mitigating evidence at sentencing." <u>Hunt v. Lee</u>, 291 F.3d 284, 292 (4th Cir. 2002)(holding that sufficient investigation rendered a decision to introduce mitigation evidence a matter of trial strategy).

Most recently, the Supreme Court in <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), reaffirmed and applied the <u>Darden-Burger</u> line of cases by offering some guidance in which constitutes both deficient performance and prejudice when analyzing a strategic decision not to offer mitigating evidence. The Court in <u>Wiggins</u> held that the petitioner had proven prejudice because he did not have a record of "violent conduct" the state could have introduced to offset the <u>legitimate</u> mitigating evidence his attorney failed to offer. <u>Wiggins</u>, 539 U.S. at 537.

(ECF No. 16 at 17-19).

Respondent contends that the SCAWV's findings were consistent with federal authority on the issue of presenting mitigating evidence and that the finding that Ms. Codispoti's decision not to present character evidence was a matter of trial strategy is consistent with the facts of record. (ECF No. 16 at 21).

Petitioner's Response to Respondent's Motion for Summary Judgment does not specifically discuss any of the claims raised in his section 2254 petition.  Rather, the Response simply restates the applicable standards of review for section 2254 petitions, motions to dismiss and motions for summary judgment, and then, in blanket fashion, states that there are genuine issues of material fact that should preclude summary judgment in this case.  (ECF No. 17).

The undersigned notes that in her Final Order Denying Writ of Habeas Corpus, following Petitioner's second omnibus hearing, Judge Berger found that Ms. Codispoti's performance fell below an objective standard of reasonableness in failing to make a motion to bifurcate the guilty and mercy phases of Petitioner's trial, in failing to call character witnesses in mitigation, in failing to argue for mercy, and in failing to object to the State's argument for no mercy.  (ECF No. 15, Ex. 8 at 2).  However, Judge Berger went on to find that "there is not a reasonable probability that in the absence of these failures, the result of the trial would have been different." (Id. at 3).

The SCAWV agreed.  In addition to the sections of the SCAWV opinion discussing this issue that were previously cited by Respondent, the SCAWV addressed the bifurcation issue as follows:

> Related to the issue of failure to call character witnesses is the appellant's claim that counsel failed to discuss bifurcation of the trial with the appellant and failed to utilize it as a vehicle to introduce mitigating

evidence on the appellant's behalf. Having found that counsel's decision not to introduce character evidence was not deficient, we likewise find that trial counsel's decision not to move to bifurcate the trial did not constitute ineffective assistance of counsel. Clearly, counsel's decision not to present character evidence obviated any need for a bifurcated trial.

700 S.E.2d at 501 n.11. Similarly, concerning the failure to ask

for mercy in closing argument, the SCAWV found:

The appellant argues that trial counsel was ineffective in failing to ask for mercy in her closing argument. We disagree. [FN 12] This Court has found that trial counsel made a reasonable tactical decision not to introduce character evidence on behalf of the appellant. As a result of not having introduced character evidence, trial counsel had no basis to support a plea for mercy during closing argument. Notably, trial counsel did request a jury instruction on mercy which the trial court gave. [FN 13] This instruction adequately informed the jury of the necessity of making a recommendation of mercy in order for the appellant to be eligible for parole. The instruction further indicated that eligibility for parole was not a guarantee of parole. Thus the jury was fully informed of the option of recommending mercy as well as the implications of that option. [FN 14 omitted]

[FN 12 - This Court's conclusion that the appellant's trial counsel was not deficient in deciding not to move for bifurcation, not to call character witnesses and not to argue for mercy conflicts with the circuit court's finding on this issue, Nevertheless, we previously have held:

This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment. Syllabus Point 3, Barnett v. Wolfolk, 149 W. Va. 246, 140 S.E.2d 466 (1965).]

[FN 13 - The appellant also contends that trial counsel failed to conduct a reasonable investigation in order to discover evidence in support of a recommendation of

mercy.  However, other than the mercy evidence discussed in the body of the opinion, the appellant fails to provide examples of evidence that a reasonable investigation would have discovered.  For this reason, we give no credence to this contention.]

700 S.E.2d at 501.

The failure to call witnesses is a tactical decision which generally does not amount to ineffective assistance of counsel. See Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir. 1977). Furthermore, ineffective assistance is not shown where witnesses who were not called to testify would not have helped the defense. See Jones v. Taylor, 547 F.2d 808, 810-811 (4th Cir. 1977). However, Petitioner's claim goes beyond the decision not to call witnesses on Petitioner's behalf.  He also claims that Ms. Codispoti failed him in not further investigating character witnesses, in not moving for a bifurcated trial in order to present character evidence, in hopes of mitigation of his sentence, and in failing to address the issue of mercy before the jury.

The Supreme Court addressed the failure to present mitigating evidence in Wiggins v. Smith, 539 U.S. 510 (2003), which was mentioned in Respondent's brief.  In Wiggins, which was a death penalty case, the Supreme Court found that the defendant's counsel did not conduct a reasonable investigation into the defendant's dysfunctional background, in which there was a history of physical and sexual abuse.  Wiggins' counsel chose to limit the scope of their investigation into his background to the details contained in

31

his presentence report.   539 U.S. at 521.   The Supreme Court focused its analysis in Wiggins on the reasonableness of the investigation supporting his counsel's decision not to introduce mitigating evidence.   The court stated that its principal concern was "whether [counsel] exercised 'reasonable professional judgmen[t]'" . . . not whether counsel should have presented a mitigation case."   539 U.S. at 522-523.   The Wiggins Court found that Wiggins' counsel's investigation "did not reflect reasonable professional judgment," and further found that counsel's failures prejudiced Wiggins' defense.   Id. at 534.   The Court stated:

> The mitigating evidence counsel failed to discover and present in this case is powerful . . . . Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed.2d 256 (1989)("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'")[overruled on other grounds] [Other citations omitted].

Id. at 534-535.

The American Bar Association's Standards for Criminal Justice address defense counsel's duty to investigate as follows:

> (a) Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.   The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense

> counsel of facts constituting guilt or the
> accused's stated desire to plead guilty.

ABA STANDARDS FOR CRIMINAL JUSTICE, DEFENSE FUNCTION, STANDARD 4-4.1(a).

Although Ms. Codispoti's recollection of her investigation was diminished by the passage of time, the evidence of record indicates that she had interviewed and subpoenaed for trial a number of character witnesses for Petitioner.  However, when Mr. Mosley pled guilty to some of the same crimes with which Petitioner was charged, as well as an additional charge of cultivation of marijuana, Ms. Codispoti made the strategic decision not to put Petitioner's character into issue.

Petitioner has presented no evidence, other than his mother's testimony at the second omnibus hearing, to demonstrate what issues about his character and background could have been placed before the jury that would have caused them to recommend that he receive mercy.  Petitioner's mother testified that he had no prior criminal history, that he had a job, that he was the primary caretaker for his young daughter, and that he was a "kind person" to others. These facts are not equivalent to the type of "mitigation" evidence that counsel failed to develop in <u>Wiggins</u>.

Moreover, as noted by the Supreme Court in <u>Wiggins</u>, to the extent that "mitigation" evidence is used by a jury to determine a defendant's moral culpability, the State easily could have turned the evidence concerning these characteristics about Petitioner

33

against him by arguing that Petitioner is someone who should have known right from wrong, who, nonetheless, committed this horrific crime.

As noted above, Petitioner also asserts that Ms. Codispoti's performance was ineffective because she failed to argue for mercy in her closing argument. (ECF No. 3 at 19). Petitioner's petition asserts:

> Although Ms. Codispoti's performance at the beginning of Petitioner's trial was deficient by waiving her client's opening statement, it was equally or perhaps more deficient in her closing. During this time, counsel never mentions mercy. Then, although the prosecutor never mentioned mercy in his initial closing, he turns around in his rebuttal and argues for no mercy. (T. Tr. 5, Day 6, pp. 66-67.) Yet, defense counsel never objected to this rule violation. Petitioner's initial habeas counsel alleged that improper closing argument by the prosecutor was error in his Supplemental Petition. This additional evidence further illustrates its inappropriateness and rule violation. According to Mr. Campbell, this created real difficulties for Petitioner. (2nd Omn. Hrg. tr., p. 113.) A review of all trial and post-trial pleadings show that not only did trial counsel fail to object during the closing, she also failed to raise it in her petition for appeal. Petitioner's initial habeas counsel likewise failed to raise this issue but it has now been properly raised. The lack of any opening on Petitioner's behalf, combined with a closing that has a prosecutor arguing for no mercy while Petitioner's trial counsel sits idly by and fails to raise the issue of mercy or even object to the prosecutor's remarks in rebuttal demonstrate deficient performance that clearly had an impact on the outcome of this verdict.

(Id.)

Respondent did not specifically address this claim in his Memorandum of Law. However, as previously cited above, the SCAWV

did address and deny this claim in its opinion denying Petitioner's habeas appeal. See Kitchen, 700 S.E.2d at 501.

An argument for mercy was inconsistent with the defense theory that Petitioner did not commit the murder. Furthermore, as discussed by the SCAWV, in light of Ms. Codispoti's strategic decision not to bring Petitioner's character into dispute, there was no basis upon which to argue for mercy. 700 S.E.2d at 501. The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that Ms. Codispoti's performance in failing to argue for mercy, or to object to the State's argument against it, fell below an objective standard of reasonableness, or that Petitioner suffered undue prejudice as a result thereof.

Based upon an exhaustive review of the record, including Ms. Codispoti's testimony in both omnibus hearings, it is apparent that Ms. Codispoti considered whether calling proposed character witnesses on Petitioner's behalf would have assisted in the mitigation of his offenses. However, given the fact that the motive for the beating of Caldwell and Starkey was Petitioner's and Mosley's belief that they had stolen marijuana from them, and the fact that Petitioner allegedly had a prior incident involving a baseball bat that was known to some of these character witnesses, Ms. Codispoti made the tactical decision not to put Petitioner's character into issue. This was purely a matter of trial strategy,

which cannot form the basis of an ineffective assistance of counsel claim. Furthermore, given the substantial evidence to support Petitioner's guilt, Petitioner has presented no evidence which would affirmatively demonstrate that, absent Ms. Codispoti's failure to present any character evidence or to argue for mercy, the outcome of Petitioner's trial would have been different.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that Ms. Codispoti's performance fell below an objective standard of reasonableness, or that he suffered undue prejudice therefrom.

<u>Failure to make an opening statement</u>

Petitioner's second claim of ineffective assistance of counsel concerns Ms. Codispoti's failure to make an opening statement during the trial. Petitioner's petition states:

> One of the most glaring and utterly inexcusable errors in Petitioner's trial was his trial counsel's waiver of an opening statement. At first, Ms. Codispoti only deferred the opening until the close of the state's evidence (T.Tr., 3, Day 2, p. 20), and the court advised the jury that trial counsel had exercised her option to give her opening after the state had presented its evidence (T.Tr., 3, Day 2, pp. 38-39.) Based on the court's representation, the jury believed and anticipated Petitioner's trial counsel would give an opening statement.

> Conversely, the state delivered a lengthy opening statement and gave the jury a preview of its evidence against Petitioner, essentially branding him a cold-blooded murderer. Despite significant eyewitnesses offered by the state during its case-in-chief, Petitioner's trial counsel advised the court that she was not going to give an opening and instead would simply put on some brief evidence. (T. Tr. 4, Day 3, p. 94.) The

36

court, apparently unaware that it had already advised the jury that trial counsel had merely deferred her opening, expressed concern that trial counsel's decision not prejudice her client.  (T. Tr. 4, Day 3, pp. 94-95.) After the parties reconvened and trial counsel again informed the court that she did not intend to deliver an opening and instead planned to call a couple "of short witnesses" that did not require an explanation, the court instructed her to "[c]over that specifically on the record before you close your evidence . . ."  <u>Id.</u> at 95.)   Yet, when the trial resumed, nothing was specifically put on the record and trial counsel merely proceeded to call her first of two brief witnesses.  (<u>Id.</u> at 96.)   The inherent prejudice in Ms. Codispoti's failure to [not; sic] deliver an opening was exacerbated by the trial court, albeit inadvertently, when it informed the jury that trial counsel merely was deferring her opening and then trial counsel never gave one.

Petitioner did not know that Ms. Codispoti had not planned to give an opening statement, even though it was clear from the court's remarks that it was a decision the client was entitled to make. (1st Omn. Hrg. Tr., pp. 94-95.)  At both evidentiary/omnibus hearings, Petitioner denied that trial counsel had ever discussed the waiver of her opening with him. (1st Omn. Hrg. Tr., p. 57.)  It is also clear from both evidentiary/omnibus hearing[] transcripts that trial counsel could not provide a good reason for waiving the opening and acknowledged it was an unusual decision to not give one.   Importantly, upon a review of both evidentiary/omnibus hearing[] transcripts, it is apparent Ms. Codispoti gave conflicting reasons why she deferred and later waived her client's opening statement. (1st Omn. Hr. Tr., pp. 39-41, 50).

During Ms. Codispoti's testimony at the second evidentiary/omnibus hearing, she contradicted her previous testimony and admitted that the individual she had consulted with regarding the medical evidence (which she earlier claimed contradicted the state's evidence) "...would not have supported the alleged contradiction" and instead "...would have agreed with the medical examiner's presentation of the evidence." (2nd Omn. Hrg. Tr., pp. 25-26.) Further, Ms. Codispoti agreed that she was aware, prior to trial, that she did not have expert evidence to support her theory regarding the medical evidence. <u>Id.</u>  It was disingenuous for Ms. Codispoti to use this alleged "contradictory medical evidence" as her

reason for deferring and eventually waiving Petitioner's opening when she knew **prior to trial** that this particular theory could not be sustained!

(ECF No. 3 at 14-16) [emphasis in original].

Respondent's Memorandum of Law in support of his Motion for Summary Judgment states that Petitioner has asserted that the failure to give an opening statement was <u>per se</u> ineffective, but offers no explanation of how an opening statement would have had any possible effect on the outcome of the trial.  (ECF No. 16 at 21-22).  Respondent further asserts that Petitioner has set forth no federal authority holding that trial counsel is required to offer an opening statement to fulfill the requirement of effective assistance of counsel.  (<u>Id.</u>)  Respondent also cites to the SCAWV's opinion affirming the denial of this claim, which states:

> We find the appellant's argument to be unpersuasive. Courts have determined the decision whether to waive the opening statement to be "essentially tactical in nature, and not objectively unreasonable," <u>Huffington v. Nuth</u>, 140 F.3d 572, 583 (4th Cir. 1998)(citations omitted), and the appellant has provided us with no legal authority to the contrary.  Also, we agree with the State's brief that "[b]ecause an opening statement is of no evidentiary value and is little more than a preview of the evidence, the decision whether or not to offer an opening remains squarely in the category of trial strategy."  Therefore, we find that trial counsel's decision to waive the opening statement is within the wide range of reasonable conduct.

<u>State ex rel. Kitchen v. Painter</u>, 700 S.E.2d at 499-500.

Respondent relies on other federal authority that mirrors the <u>Huffington</u> holding that the decision of whether to offer an opening statement is a strategic one that will ordinarily not constitute a

38

basis for an ineffective assistance of counsel claim.  See Moss v.
Hofbauer, 286 F.2d 851, 863 (2d Cir. 2002) (citing United States v.
Haddock, 12 F.3d 950, 955 (10th Cir. 1993), United States v.
Rodriquez-Ramirez, 777 F.2d 454, 458 (9th Cir. 1985) and United
States v. Salovitz, 701 F.2d 17, 20-21 (2d Cir. 1983)).  (ECF No.
16 at 22).

As noted by Respondent, during the evidentiary hearings, Ms.
Codispoti stated that she made the tactical decision to defer her
opening so that she could see how the State's evidence unfolded.
(ECF No. 15, Ex. 17 at 39-40).  Ms. Codispoti further stated that
she elected not to give an opening before the defendant's case-in-
chief because she wanted some inconsistencies in the State's case
to go unanswered until closing arguments and did not want to give
the State an opportunity to call rebuttal witnesses.  (Id.) (ECF
No. 16 at 23).  Respondent further asserts:

> Nothing in trial counsel's explanation supports a finding
> that her actions were not perfectly reasonable in light
> of the evidence of guilt and the absence of a factual
> basis for a legitimate defense.  Moreover, trial counsel
> offered her defense theories in the closing arguments and
> there is nothing in the record to suggest that had trial
> counsel given an opening, the verdict would have been
> more favorable.
>
> Although Petitioner cites to many suggestions for an
> opening such as a non-existent defense unsupported by
> subsequent factual development, or maybe dubious
> mitigating evidence, Petitioner fails to adequately
> explain how any such opening could overcome the evidence
> of guilt presented at trial sufficiently to result in a
> more favorable verdict.  With regard to Petitioner's
> complaint that the State, in its opening, "brand[ed] him
> a cold-blooded murderer[,]" [t]he State did not brand

39

Petitioner a "cold-blooded murderer," the facts did.
(Petition at 14.)

(Id. at 23-24).

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has not demonstrated that Ms. Codispoti's
tactical decision not to make an opening statement fell below an
objective standard of reasonableness and, further, that Petitioner
has not demonstrated that he suffered undue prejudice from that
decision.

### Failure to effectively cross-examine State witnesses

Petitioner also asserts that Ms. Codispoti failed to
effectively cross-examine the State's witnesses to elicit evidence
helpful to her theory of defense. (ECF No. 3 at 17). Within this
section of his petition, Petitioner asserts that Ms. Codispoti
failed to elicit any medical evidence through the State's medical
witnesses to support her theory that the injuries sustained by
Caldwell were inconsistent with the testimony of how Petitioner
allegedly struck Caldwell. (Id. at 17).

Petitioner further asserts that Ms. Codispoti failed to
emphasize that only one of the eye-witnesses, Rodney Nelson,
purportedly saw Petitioner strike Caldwell in the head. Petitioner
emphasizes that Nelson's credibility was questionable because,
initially, he was not completely forthcoming with the police.
Petitioner maintains that such facts "could have arguably bolstered
her theory of defense that Petitioner did not kill Andrew

40

Caldwell."  (Id.)

Petitioner further contends that Ms. Codispoti:

failed to effectively elicit and/or convey to the jury
that Carl Starkey, the other victim, provided an initial
statement to the State Police that placed most or all of
the other men (Nelson, Lambert, Miller and White) at the
scene with Petitioner and Mosley when the attack
occurred, a disclosure that was entirely inconsistent
with the trial testimony of these four men and with the
state's closing argument.  Apparently, trial counsel
failed to have the State Police investigation or the
statements of Starkey or these other witnesses introduced
during the trial, and consequently failed to draw out
critical inconsistencies in each of their initial
statements to the State Police and subsequent testimony
at trial.  Had she been more thorough, her cross-
examinations of these witnesses could have considerably
bolstered her theory that "[Petitioner] didn't do it."

Furthermore, three witnesses also testified that
they believed Andrew Caldwell and Carl Starkey or someone
had a gun.  (T. Tr. 3, Day 2, pp. 55, 100-101, 136; T.
Tr. 4, Day 3, p. 68.)  However, none of this evidence was
used to bolster her purported self-defense theory in
closing argument, because counsel had failed to
effectively develop either theory during trial.

(Id. at 17-18).

Finally, Petitioner contends that Ms. Codispoti failed to

establish, through the statements of the eye-witnesses, that

"Petitioner had actually pulled the co-defendant off the other

victim because he was concerned he may drown or that Petitioner

actually left before the altercation had concluded." (Id. at 18).

Petitioner further contends that more emphasis on testimony that

"there was no intent to kill anybody" could have helped to develop

a theory for a second degree murder case.  (Id.)

Petitioner expands on these claims of ineffective assistance of counsel in his assertion that Ms. Codispoti presented inconsistent defense theories and failed to sufficiently develop either of them, leading to a "fragmented, and unreasonable, trial strategy." (Id. at 18). Petitioner's section 2254 petition further asserts:

> Trial counsel's first theory of defense was inconsistent with her "self-defense" theory. Ms. Codispoti utilized two inconsistent theories of defense: one theory was apparently that Petitioner was not the individual who committed the murder (1st Omn. Hrg. Tr., p. 38); another was a theory of self-defense, evidenced through Ms. Codispoti's cross-examination of the State's witnesses, pretrial discussions with the court and the State (about witnesses that counsel had subpoenaed but then never called to testify) and a tendered jury instruction that the court gave on self-defense at the conclusion of the trial. (T. Tr. 2, Day 1, pp. 5-6; T. Tr. 3, Day 2, pp. 55, 100, 136, 147, 185; T. Tr.4, Day 3, pp. 5, 68; T. Tr. 5, Day 4, pp. 28-29.)

> When asked what her theory of defense was during the first evidentiary hearing, Ms. Codispoti responded that ". . . our defense strategy was [Petitioner] was not the individual that committed the murder . . . and our trial strategy . . . was . . . to try to discredit the State's evidence." (1st Omn. Hrg. Tr., p. 38.) She purportedly attempted to show that the State's evidence contradicted the medical evidence through cross-examination and other evidence. (Id. at pp. 38-39.)

> However, Ms. Codispoti failed to develop her theory of defense or trial strategy with respect to the medical evidence presented by the State, even though Ms. Codispoti stated that she found it to be contradictory. (1st Omn. Hrg. Tr., p. 40.) She acknowledged that she consulted with a [medical] expert [during her pretrial investigation] to determine if Petitioner's version was consistent with the medical examiner's report. (Id. at p. 30.) Yet, she never called any witnesses during her case in chief regarding the medical evidence, nor effectively questioned Dr. Sabet, the assistant medical

examiner who performed Mr. Caldwell's autopsy, about
these potential inconsistencies.  (T. Tr. 3, Day 2, pp.
119-21.)  Trial counsel also did not question Dr. Lopez,
one of Mr. Caldwell's treating physicians, about his
injuries.  (Id. at 125.)  Furthermore, trial counsel
failed to explain her trial strategy to Petitioner or
that disproving the State's medical evidence was part of
her theory of defense.  (1st Omn. Hrg. Tr., pp. 56-57.)

Given Ms. Codispoti's testimony at the habeas
evidentiary hearing and her closing remarks at trial, it
is apparent that she planned to rely on the medical
evidence to support her theory that Petitioner did not
kill Mr. Caldwell.  Yet, she consulted with an expert but
then did not call one and failed to even consult with her
client about the meeting or her theory.

(Id. at 20-21).  Petitioner contends that, given the eye-witnesses

who testified that they saw Petitioner strike Caldwell in the head,

or saw him with a baseball bat near Caldwell, "it was crucial for

her to rebut this evidence if she wanted to convince the jury that

Petitioner was not the individual who committed murder."  (Id. at

21).  Yet, Petitioner contends that Ms. Codispoti "failed to produce

any witnesses or independent evidence to support her theory and did

not appear to even credibly rebut State's witnesses on cross-

examination even with helpful facts she had in her possession."

(Id.)

Petitioner relies upon Mr. Campbell's opinion presented in the

second omnibus hearing to support his claim.  Mr. Campbell asserted

that, because Ms. Codispoti did not give an opening statement, "it

was almost impossible to know where she was going nor did he think

that [Ms. Codispoti] knew where she was going with her theory of

defense."  (Id.)  Mr. Campbell further stated that the defense

43

theories were inconsistent, and that Ms. Codispoti did not coherently present her theories in her closing argument. (<u>Id.</u>)(<u>See also</u>, ECF No. 15, Ex. 18 at 101-103). He acknowledged that Ms. Codispoti was fighting an uphill battle, given the damning eyewitness testimony, which made the "He didn't do it" defense that much harder to prove. (<u>Id.</u> at 102-103).

Petitioner's petition further states:

It is entirely unclear from the record how trial counsel planned to "effectively" develop this particular theory of defense without more evidence to bolster it. Furthermore, even after Ms. Codispoti had heard the State's evidence, she failed, as part of her defense strategy, to mitigate Petitioner's potential sentence to life in prison and did not develop or otherwise put on any evidence to support a recommendation of mercy. Ms. Codispoti's "theory" of defense was prejudicial to Petitioner because counsel never gave the jury a clear picture of where she was headed with it.

Although Ms. Codispoti testified that her theory of defense was that Petitioner wasn't the individual who killed Mr. Caldwell, she also offered a self-defense theory which resulted in a jury instruction on self defense at the close of trial. (T. Tr. 5, day 4, pp. 28-29;ist Omn. Hrg. Tr., p. 38.) Also, during a pretrial discussion with the court, Ms. Codispoti indicated, over the State's objection, that she may offer character witnesses on both victims' propensity to carry guns and use them as well as theft or theft of guns, depending on the State's case. (T. Tr. 2, Day 1, pp. 5-6.) However, she never called any of these witnesses during the trial, even though at least three of the State's witnesses testified that they heard someone yell there was a gun and/or they were scared that someone had one. (T. Tr. 3, Day 2, pp. 55, 100-01, 136, 147; T. Tr.4, Day 3, p.68.) Other than vague references to these witnesses during her closing, trial counsel never presented this theory of defense as a viable option for the jury to consider in its deliberations. This theory was also entirely inconsistent with trial counsel's theory that Petitioner was not the individual that killed Mr. Caldwell. Thus,

> offering the jury two inconsistent and undeveloped
> theories undermined both.  Consequently, both theories
> were ineffective as a result of Ms. Codispoti's poorly
> developed and unreasonable trial strategy and was highly
> prejudicial to Petitioner.

(ECF No. 16 at 22).

Respondent addressed all of these claims of ineffective assistance of counsel in a section entitled "Theory of Defense Issues" in his Memorandum of Law in support of his Motion for Summary Judgment (ECF No. 16 at 24-28).  Respondent's Memorandum states in pertinent part:

> It is clear from the record that trial counsel's
> cross-examination of the State's witnesses the trial
> counsel [sic; It is clear that trial counsel's cross-
> examination of the State's witnesses] attempted to
> impeach their testimony and possibly lay the foundation
> for either self defense or actual innocence by
> undermining the credibility of the witnesses.  Trial
> counsel's attempt to impeach the credibility of the
> witnesses was obvious from a clear reading of the record.
> However, trial counsel was limited in how far she could
> go with either theory of defense in light of not only the
> evidence, but the witnesses' own admissions that they
> initially lied out of fear.
>
> As previously noted, the <u>Chronic</u> Court found that
> the Sixth Amendment does not require[] that counsel do
> the impossible.  Rather, the Court noted on this point,
> that, even if defense counsel may have made demonstrable
> errors, "[w]hen a true adversarial criminal trial has
> been conducted . . . the kind of testing envisioned by
> the Sixth Amendment has occurred."  466 U.S. at 656.
>
> Aside from the conflict between Petitioner's
> suggested defenses of actual innocence, self defense
> and/or being willing to settle for second degree, the
> record shows that trial counsel extensively questioned
> the witnesses regarding inaccuracies and inconsistencies
> in their versions of events.  Not only that, several of
> the witnesses testified during the State's case-in-chief
> that they lied because they were afraid.

45

(Id. at 24-25).

Respondent's Memorandum further addresses specific details that Ms. Codispoti drew out on cross-examination that supported her defense theories:

> On cross-examination, trial counsel elicited testimony from Lambert that he never actually saw Starkey driving towards the area of the crime on the four wheeler but just "figure[d] it was [him]." ([ECF No. 15, Ex. 14] at 143.) Trial counsel also managed to elicit[] an admission from Lambert that he did not actually see the moment of the strike on Caldwell by Petitioner but only saw him "bringing the ball bat away from Andrew's arm." (Id. at 146.) Trial counsel further elicited testimony from Lambert that he initially stated that someone was yelling that Caldwell had a gun and he himself relayed this information to others. (Id. at 147.) In fact, trial counsel went into great detail with Lambert on his initial statements that he had reason to believe Caldwell had a gun, going so far as to bring out that Lambert himself saw Caldwell make a move towards his waistband as if he were retrieving a gun. In further support of a potential self-defense theory, trial counsel elicited testimony from Lambert that he had stated in his original statement to law enforcement that Carl Starkey had threatened Petitioner on prior occasions. (Id. at 151.)

> On the cross-examination of Lambert alone, trial counsel brought out evidence that there was a point where there was reason to believe Caldwell had a gun and that Petitioner had been threatened by Caldwell before the crime. On direct, Lambert admitted his story had been inconsistent and that he had lied because he was afraid.

> The testimony of Brian [sic; Rodney] Nelson was similar. Nelson admitted, on direct examination, that he lied in his initial statement because he too was afraid. (Tr. 176, June 4, 1996.) In fact, within only a few weeks after the crime, Nelson relocated to Tennessee. (Id.) On cross-examination, trial counsel questioned Nelson about the inconsistencies in his statements. (Id. at 181-82.) Trial counsel also raised the issue that Petitioner might not have been the killer when she questioned Nelson about whether or not he wielded any sort of weapon during the attack. (Id. at 184.)

Tommy Miller's testimony was more of the same.  On cross he admitted that he lied in his statements.  (Tr., 206, June 4, 1996.)   Trial counsel questioned Miller about his motivations, his truthfulness and questioned his level of involvement.  (Id. at 214.)  In fact, trial counsel flatly asked Miller if he conspired with the others to "pin this on [Petitioner.]"  (Id. at 215-16.)

The record indicates that trial counsel was more than competent on cross-examination.   Trial counsel elicited testimony that there was talk of a gun, that some of the witnesses did not actually see the strikes, that Caldwell may have previously threatened Petitioner, and that they had all flat out lied in their initial statements to police.

As far as inconsistencies in the witnesses' statements supporting a frame-up defense going to actual innocence, the fact is, the witnesses were hanging around a hollow drinking beer with a known marijuana dealer who attacked and killed a man (after telling them he was planning to do just that) and after they engaged in a certain amount of what could be viewed as conspiratorial conduct.   Not surprisingly their statements were less than forthcoming and contradictory and as such do not necessarily support a frame-up defense.

(Id. at 26-27).

Finally, Respondent's Memorandum addresses the failure to call a medical expert to rebut the medical examiner's testimony about the victim's wounds, in an attempt to support a theory that someone else delivered the fatal blow by stomping on Caldwell's head, as alleged by Petitioner.  Respondent notes that the potential expert that Ms. Codispoti contacted agreed with the medical examiner's testimony and, thus, would not have supported that defense theory. (Id. at 27).

The SCAWV addressed several of these claims of ineffective assistance of counsel individually.   Concerning the failure to

47

effectively cross-examine the State's witnesses, the SCAWV found as follows:

> It is the position of the appellant that his trial counsel failed to conduct effective cross-examination of the State's witnesses. Specifically, the appellant avers that counsel failed to bring out in cross-examination and in her closing argument that only one witness, Rodney Nelson, testified that he saw the appellant strike the victim in the head. After examining all of the evidence introduced against the appellant, we believe that counsel's omission is not significant. The medical evidence indicated that Mr. Caldwell had three head injuries as well as numerous skull fractures, and that he died as a result of multiple blunt force injury to the head. Also, according to the witnesses of the attack, the appellant was the only person who struck Mr. Caldwell. Specifically, Mr. Starkey and Mr. Miller testified that they saw the appellant strike Mr. Caldwell with the bat although they did not specify where the appellant hit the victim. Mr. Lambert testified that he saw the appellant bringing the bat away from Mr. Caldwell's arm and Mr. White testified that he saw the appellant standing over Mr. Caldwell with a bat in his hands. Finally, Mr. Mosley testified that he heard the appellant yell at the victim to "lay down," and he heard a "big pop." In light of this evidence, we find that trial counsel's failure to emphasize to the jury that only one witness actually saw the appellant strike Mr. Caldwell in the head does not constitute ineffective assistance of counsel.

700 S.E.2d at 496.   The SCAWV's opinion then made the following conclusion:

> In sum, the transcript indicates that trial counsel attempted to reveal alleged inconsistencies between each witness's trial testimony and statements he previously gave to law enforcement authorities. Trial counsel also attempted to reveal discrepancies between the accounts testified to by the witnesses. Therefore, we find no merit in the appellant's claim that his trial counsel failed to conduct effective cross examination at trial. [FN 6].

[FN 6 - According to the appellant, counsel also failed to elicit any medical evidence from the medical professionals to support her initial theory that the State's evidence of the circumstances of Mr. Caldwell's murder contradicted the medical evidence. However, the appellant also indicates that no medical evidence supported trial counsel's theory. Obviously, counsel cannot be faulted for failing to elicit evidence, via cross-examination, that did not exist.

The appellant further accuses his trial counsel of failing to cross examine the State's witnesses concerning testimony that there was no intent to kill anybody. However, the appellant's brief does not clearly indicate where this testimony appears in the record. Therefore, this Court is unable to provide a meaningful review of this issue.]

Id. at 497.

Concerning Petitioner's claim that Ms. Codispoti's defense theories were inconsistent and insufficiently developed, the SCAWV found as follows:

According to the appellant, counsel utilized two inconsistent theories of defense -- the appellant was not the individual who committed the murder, and self-defense. The appellant also makes the incongruous contention that counsel failed to develop and explain the theory of self-defense to the jury.

The circuit court, in denying habeas relief to the appellant, found with regard to this issue, that no substantive evidence was brought forth that supported a self-defense claim and that indicated that the incident was anything other than an unprovoked attack by the appellant and Mr. Mosley. We agree with the circuit court. "Ordinarily, self-defense is not available to the aggressor in an affray who precipitates it without legal justification." State v. Watson, 164 W. Va. 642, 651, 264 S.E.2d 628, 633 (1980)(citations omitted). The evidence at trial was that the appellant precipitated the affray without legal justification by obtaining a ball bat and lying in wait for the purpose of ambushing the victim. Considering this evidence, we find that it was not ineffective assistance of counsel not to develop a

theory of self-defense. [FN 7]

[FN 7 - In support of his argument that trial counsel should have developed a self-defense theory, the appellant refers to evidence that the appellant believed that Mr. Caldwell and Mr. Starkey could have been carrying guns . . . The testimony cited by the appellant does not support a theory of self-defense under the facts of this case. The evidence indicates that the appellant and Mr. Mosley were the aggressors in the altercation in that they lay in wait with baseball bats in order to ambush the victims.  Also, there is no evidence that either of the victims actually drew a firearm on his attacker.  Finally, the above testimony does not indicate that the appellant believed that the victims were in possession of firearms.]

Moreover, the appellant's argument that his trial counsel failed to develop a cogent and consistent theory of defense is also unavailing.  This Court's review of the trial transcript indicates that counsel attempted to create reasonable doubt by revealing alleged inconsistencies in the witnesses' accounts of the murder as well as the discrepancies between eyewitness testimony and the medical evidence.  In addition, trial counsel attempted to show that those who were present when the murder occurred agreed to falsely accuse the appellant of the murder.

Id. at 498-499.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel's conduct fell below an objective standard of reasonableness under the circumstances of this case.  Nor has Petitioner demonstrated that, but for the alleged errors of his counsel, the outcome of his trial would have been different.

Ineffective assistance at critical stages and on appeal

Petitioner also claims that Ms. Codispoti's decisions concerning the waiver of a pre-trial preliminary hearing, her

preparedness to defend a pre-trial Rule 404(b) motion, and her conduct in handling his direct appeal fell below an objective standard of reasonableness and resulted in undue prejudice to his defense.  (ECF No. 3 at 22-25).  Concerning Ms. Codispoti's pre-trial conduct, Petitioner's petition states as follows:

> At a critical pretrial stage, Ms. Codispoti failed to conduct a preliminary hearing for purposes of discovery, despite the seriousness of the charges against her client.  Petitioner testified at the first evidentiary hearing that the reason trial counsel had advised him to waive the preliminary hearing was "...that I stood a chance of losing my bond if I went ahead with the hearing." [2nd Omn. Hrg. Tr., p. 56.] Interestingly, Ms. Codispoti had already secured bond for Petitioner prior to the preliminary hearing and he had already been released from jail.  Id.  The hearing would have also likely given her an opportunity to cross-examine some or all of the witnesses who later admitted they had lied to the State Police in their initial statements.

> Ms. Codispoti was not fully prepared and armed with applicable case law at a pretrial hearing one week prior to trial when the introduction of uncharged conduct, i.e., cultivation of marijuana, was discussed.  Under West Virginia law, when determining whether to let uncharged conduct to be introduced at trial, the trial court is required to conduct an in camera hearing and determine, by a preponderance of the evidence, that the bad act occurred and that it was committed by the defendant.  Despite that legal mandate, due to counsel's failings, this did not occur.  Instead, Ms. Codispoti, due to inadequate research and investigation, merely made an unreasoned objection with no idea whatsoever why she was even objecting.  She never directed the trial court to the WVSCA case of State v. McGinnis, a landmark case that spells out what must occur before 404(b) evidence can be admitted.  None of which happened, and the evidence, the alleged cultivation of a marijuana field, came in as a motive.

> Importantly, even when co-defendant, Hank Mosley, entered a plea to cultivation of marijuana, he did not provide the trial court with specific information of the

> marijuana field allegedly cultivated by he and
> Petitioner, nor its alleged locale. The trial court
> allowed the plea to come in despite any evidence of it.
> No evidence or argument was offered by the State to
> establish the actual existence of a marijuana field.
> Greg Campbell testified that the trial got messed up and
> improperly polluted by the introduction of the 404(b)
> evidence and the plea and definitely got out of hand.
> (2nd Omn. Hrg. Tr., pp. 103-04).

(<u>Id.</u> at 24-25).

Respondent addressed the Rule 404(b) evidence issue in his

Response as follows:

> Petitioner argues in support of his claim of
> ineffective assistance of counsel, that trial counsel
> failed to cite a pivotal state case when objecting to the
> admission of evidence of prior bad acts. Petitioner
> argues that because trial counsel did not cite to the
> proper authority on the issue of the admission of prior
> bad acts, she was facially ineffective.

(ECF No. 16 at 28). Respondent then cites to the SCAWV findings on

the substance of the Rule 404(b) issue. (<u>Id.</u> at 28-29). As will

be discussed in greater detail in the undersigned's analysis of

Ground Two herein, the SCAWV found that the evidence of other bad

acts was properly admitted under state evidentiary rules.

Respondent correctly notes that:

> The [SCAWV] found that the challenged evidence [was]
> admissible under controlling state court rules and
> precedent including the pivotal case of <u>State v.
> McGinnis</u>, cited by Petitioner as the case trial counsel
> failed to raise in her argument. Therefore, any citation
> to <u>McGinnis</u> by trial counsel would have had no effect on
> the court's ruling.
>
> This claim does not support a finding that the
> [SCAWV] misapplied controlling precedent on this issue.

(<u>Id.</u> at 29).

The same holds true for Ms. Codispoti's failure to cite to McGinnis in her appellate brief.  The SCAWV addressed this in its opinion as well:

> According to appellant, trial counsel's performance at the appellate stage was deficient in that she failed to present any substantive factual or legal analysis to support the issues raised in her petition for appeal before this Court.  The only specific example of this failure given by the appellant is trial counsel's failure to discuss State v. McGinnis, 193 W. Va. 147, 455 S.E.2d 516 (1994), to challenge the admission at trial of evidence of the appellant's marijuana cultivation.  As this Court explains in section III.B, infra, however, admission of evidence of the appellant's marijuana cultivation was not improper.  Therefore, counsel's failure to discuss McGinnis in the appellant's petition for appeal was not prejudicial. [Footnote omitted].

700 S.E.2d 498-499.[2]

Petitioner also alleges that Ms. Codispoti failed to advise or explain to him the implications of the plea offer made by the State, which included a plea to first degree murder, with a recommendation of mercy.  (ECF No. 3 at 23).  Petitioner claims that, even though he does recall Ms. Codispoti telling him about the plea offer, "he does not recall her explaining it to him in relation to the evidence in the case and the strengths and

---

[2] Petitioner's petition also mentions that his counsel failed to request oral argument before the SCAWV.  Ms. Codispoti testified that she did not believe argument was necessary.  (ECF No. 17 at 45).  Other than the McGinnis issue, Petitioner has not identified what Ms. Codispoti should have presented in argument that would have altered the outcome of his appeal.  In light of the SCAWV's finding that Petitioner's argument concerning the failure to specifically address McGinnis lacks merit, this allegation of ineffective assistance of counsel is also meritless.

weaknesses of the State's case nor the advantages or disadvantages of going to trial as opposed to accepting the offer. (Id. at 23-24)(citing to the second omnibus hearing transcript, ECF No. 18 at 61). Petitioner does not elaborate on how any further explanation or advice from Ms. Codispoti would have caused him to accept the plea offer.

Ms. Codispoti testified at the first omnibus hearing that, after the plea offer was made by the State, she and Petitioner "discussed it at length." (ECF No. 17 at 33). She also stated that she "assumed he had some questions," but it was so long ago, she could not recall the details of those questions. (Id.) Ms. Codispoti further testified that she did not recall Petitioner ever being willing to plead to the charges as presented in the plea offer and that the prosecutor did not offer any alternatives. (Id. at 34). Ms. Codispoti further testified that she believed she recommended that Petitioner take the plea and he still refused. (Id. at 34-35).

Ms. Codispoti repeated this same recollection in her testimony in the second omnibus hearing. (ECF No. 18 at 11-14). When asked if she explained the pros and cons of taking the plea offer versus going to trial, Ms. Codispoti testified:

    A.  That would have traditionally been how I would have
        handled the situation. Now, to specifically say I
        recall sitting down with Mr. Kitchen and exactly
        the details of the conversation and what we went
        over, I couldn't tell you that.

(Id. at 14).

It is apparent from this testimony that Ms. Codispoti conveyed the plea offer, discussed it with Petitioner, and recommended that he take the plea offer, but Petitioner was not interested in taking the offer.  In hindsight, Petitioner may regret his decision, but Ms. Codispoti's conduct fell within the standards of defense function concerning plea discussions.   See ABA STANDARDS FOR CRIMINAL JUSTICE, DEFENSE FUNCTION, STANDARD 4-6.2.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that Ms. Codispoti's performance concerning the plea discussions fell below an objective standard of reasonableness; nor has he demonstrated undue prejudice therefrom.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that Ms. Codispoti rendered ineffective assistance of counsel in any critical stages of his criminal proceedings or on appeal.

For all of the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on his claims of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on all of the claims of ineffective assistance of counsel as pled in

Ground One of Petitioner's section 2254 petition.

**B.    Ground Two - Admission of evidence concerning marijuana cultivation.**

In Ground Two of his section 2254 petition, Petitioner contends that the trial court improperly allowed the admission of his co-defendant's guilty plea and other evidence of prior uncharged misconduct against Petitioner. Petitioner further claims that this action impugned the fundamental fairness of his trial. (ECF No. 3 at 27-32). Petitioner's petition asserts that the state habeas court incorrectly found that the trial court engaged in the required procedures before finding that this evidence was admissible. His petition states:

> Judge Berger states the trial court appropriately held an *in camera* hearing over the course of two separate days on the 404(b) evidence prior to its admission. Judge Berger's finding on this issue, however, is erroneous. The trial court did not hold any appropriate hearing, as required by West Virginia law, over the course of two days. Indeed, the trial court failed to hold the appropriate hearing entirely. A pre-trial conference hearing **was** held on 28 May, 1996, but that hearing was held on the State's motion to allow the statements of three different individuals based on an analysis of West Virginia Rules of Evidence (hereinafter "W.Va.R.E.") Rule 803. (Pre-trial Conference Hearing Transcript, pages 4-5, 6-7. Hereinafter PreTr. Conf. Hrg. pp. ____.)
>
> It is undisputed that the trial court did not make the requisite findings that supported the admissibility of the alleged uncharged misconduct of Petitioner that the State exclusively relied upon as Petitioner's motive for the crime of first degree murder. Specifically, the trial court improperly allowed the State to introduce evidence of the theft of marijuana that was allegedly being cultivated by Petitioner and his codefendant by the victims prior to the alleged crime to show Petitioner's motive in the commission of the crime. (*See* 6/3/96

56

Order.)  Despite defense counsel's objection that the
evidence should not be admitted due to its prejudicial
effect, the trial court allowed the introduction of such
evidence through the testimony of Carl Starkey, Hank
Mosley and Jake White, and found the evidence was
material on the issues of motive, intent, and
deliberation, elements of the crime of first degree
murder, and that the probative value outweighed the
prejudicial effect.  (PreTr. Conf. Hrg., pp. 5-19.)
However, the trial court failed to hold the mandatory *in
camera* hearing to determine by a preponderance of the
evidence whether or not the collateral crime, i.e.,
cultivation of marijuana, actually occurred or that
Petitioner committed such acts as required by Rule 404(b)
of the W.Va.R.E.  At no time did the State offer
extrinsic evidence or otherwise establish the actual
existence of a marijuana field or that Petitioner
committed the unlawful act.  In fact, the pretrial
hearing transcript speaks for itself and demonstrates
that the trial court failed to undertake the required
finding by a preponderance of the evidence that the other
acts occurred.

(Id. at 27-28).

    Petitioner's petition further contends that the State
emphasized this evidence in its opening statement, throughout its
case in chief, and in its closing argument.  Petitioner contends
that, "[w]ithout admission of this evidence, the State lacked
motive for the crime and the record lacks sufficient support for
Petitioner's convictions of conspiracy or first degree murder."
(Id. at 28).  Petitioner further contends that the State presented
no extrinsic evidence of the cultivation of marijuana, or
Petitioner's connection thereto, and that, even the witness
statements concerning the alleged motive did not have sufficient
indicia of reliability to confirm that Petitioner was ever in
possession of marijuana, let alone cultivated it.  (Id. at 28-29).

57

Petitioner further contends that the trial court improperly admitted evidence of his co-defendant, Hank Mosley's, guilty plea to the offense of cultivation of marijuana, a felony offense with which neither Petitioner, nor Mosley, were charged. (Id. at 29). Petitioner further contends that the state habeas court failed to issue specific findings concerning this claim. (Id.) Petitioner's petition further states:

> Prior to Mr. Mosley's testimony, the trial court ruled that "Mr. Mosley's guilty pleas would be admissible where that testimony is offered not for the purpose of proving the guilt of [Petitioner] but on the issue of Mr. Mosley's credibility." (May 31, 1996, Pretrial Transcript, pp. 39-40.) The trial court further opined that if the State offered such evidence, it would give a limiting instruction that explained the limited purpose of its admissibility. Id. At trial, Mr. Mosley testified about the events that transpired on October 1, 1995, including acts he committed and that prompted his guilty plea to malicious assault, conspiracy to commit malicious assault on Carl Starkey, and cultivation of marijuana. (Tr. T. 4, Day 3, pp. 42-62.) Neither he nor the State, however, offered testimony or evidence that described acts he committed to support his guilt of the particular crime of cultivation of marijuana. Id. Nor was the jury ever told that he was not initially charged with the cultivation of marijuana and instead plead guilty to it by information only three days before Petitioner's trial began. Id.

(Id. at 29-30).

Petitioner further asserts that the limiting instruction given by the trial court concerning Mr. Mosley's testimony was confusing to the jury. (Id. at 30). He contends that the instruction actually opened the door to multiple uses and interpretations by the jury. (Id.) The portion of the instruction cited by

58

Petitioner states:

> THE COURT: . . . Members of the jury, you have heard
> evidence that the witness, James Hank Mosley, has plead
> guilty to crimes which arose out of the same events for
> which the defendant is on trial here and to the
> cultivation of marijuana.   You are reminded that
> [Petitioner] is not charged in this indictment with the
> cultivation of marijuana.   Those pleas are not evidence
> that the defendant on trial is guilty or that the crime
> charged in the indictment was committed by [Petitioner.]
> You may consider this witness's guilty plea only for the
> purpose of determining how much, if any at all, to rely
> upon his testimony.   The guilt or innocence of the
> defendant on trial must be determined solely by you,
> solely by the evidence introduced in the trial of this
> case.  (Tr. T. 4, Day 3, pp. 62-63.)

(Id. at 30).   Petitioner then claims that the following four

paragraph instruction created confusion for the jury:

> Once again you have heard evidence concerning the
> alleged conduct or acts of the defendant concerning the
> cultivation or possession of marijuana which are not
> charged in the indictment in this case.  You are again
> instructed that such evidence is admitted for the limited
> purpose only, and it may be considered by you only
> whether [sic; in] deciding whether a given issue or
> element relevant to the present charges has been proven.

> In this instance, the evidence may be considered
> only for the purpose of determining whether the State has
> proven and established a motive of the defendant and
> whether there was any preparation and planning of the
> acts charged in the indictment.

> The defendant is not now being tried for any of the
> specific acts to which this evidence relates, that being
> the cultivation or possession of marijuana, and you
> should bear this fact definitely in mind.

> Such evidence was admitted and should be considered
> by you only so far as in your opinion it may go to show
> the motive of the defendant in connection with the
> offenses with which he is charged in this indictment, and
> it may go to show whether there was preparation and
> planning of the acts in connection with the offenses of

conspiracy to which he is charged in this indictment.
(ECF No. 15, Ex. 15 at 63).  The undersigned notes that similar
instructions were given to the jury after the close of all the
evidence, prior to closing arguments. (ECF No. 15, Ex. 16 at 25-
26).

Petitioner contends that these instructions given to the jury
concerning Mr. Mosley's testimony could have led the jury to
believe that they could consider Mr. Mosley's testimony regarding
his plea to cultivation of marijuana to implicate Petitioner in the
same, and not just on the issue of Mr. Mosley's credibility, noting
that the word "credibility" was not even mentioned in the
instruction. (ECF No. 3 at 30).  Petitioner further contends that
the allegedly cofusing instructions given to the jury were
misleading and effectively impugned the fundamental fairness of the
entire trial. (Id. at 30-31).  Petitioner maintains that:

> To this day no reliable proof has been brought forth that
> Petitioner was involved in the cultivation of a marijuana
> patch and the trial court's admission of such self-
> serving testimony without a finding by a preponderance of
> the evidence of the existence of the same without proper
> limiting instructions impugned the fundamental fairness
> of the trial proceedings.

(Id. at 32).

Respondent's Memorandum of Law in support of his Motion for
Summary Judgment contends that this claim is purely a matter of
state law that does not challenge the evidence in the context of a
federal constitutional right and, thus, is not cognizable in

federal habeas corpus. (ECF No. 16 at 32). Respondent's
Memorandum further states:

> In order to raise the specter of a violation of due
> process flowing from an evidentiary ruling a petitioner
> must show a violation of "those fundamental conceptions
> of justice which lie at the base of our civil and
> political institutions and which define the community's
> sense of fair play and decency." Dowling v. United
> States, 493 U.S. 342, 353 (1990)(citations omitted).
> State court evidentiary rulings do not rise to the level
> of due process violations unless they "offend . . . some
> principle of justice so rooted in the traditions and
> conscience of our people as to be ranked as fundamental."
> Patterson v. New York, 432 U.S. 197, 202 (1977)(citations
> omitted).

> As a threshold matter, the issue of whether an
> admission of uncharged crimes can ever
> constitute a violation of the Due Process
> Clause has not been decided by the Supreme
> Court. See Estelle v. McGuire, 502 U.S. 62,
> 75 n.5, 112 S. Ct. 475, 116 L. Ed.2d 385
> (1991)("[W]e express no opinion on whether a
> state law would violate the Due Process Clause
> if it permitted the use of 'prior crimes'
> evidence to show propensity to commit a
> charged crime.") Given that the Supreme Court
> had not held that the use of uncharged crimes
> would violate the Due Process Clause, the
> Appellate Division's rejection of this claim
> is hardly either contrary to or an
> unreasonable application of clearly
> established Supreme Court law. Consequently,
> I cannot find a due process violation because
> to do so would amount to the creation of a new
> rule of constitutional law, which a federal
> court is not permitted to do in a habeas
> corpus proceeding. See Teague v. Lane, 486
> U.S. 288, 316, 109 S. Ct. 1060, 103 L. Ed.2d
> 334 (1989).

Jones v. Conway, 442 F. Supp.2d 113, 131 (S.D.N.Y. 2006).

(Id. at 32-33). Respondent also cites Barbe v. McBride, 521 F.3d
443, 452-53 (4th Cir. 2008), in which the Fourth Circuit held:

Importantly, in considering federal habeas corpus issues involving state evidentiary rulings, "we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993)(internal quotation marks omitted); see also Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991)(explaining that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States"). In light of these limitations on the scope of our inquiry, we confine our consideration of the Confrontation Issue to the question of whether the Rape Shield Ruling contravened Barbe's Sixth Amendment confrontation right, without examining such issues as whether the state circuit court properly interpreted the West Virginia rape shield law itself.

Respondent contends that Petitioner has failed to argue how the admission of the challenged evidence rendered his trial "fundamentally unfair." (Id. at 33).

The SCAWV found as follows on this claim:

In his second assignment of error, the appellant asserts that it was reversible error for the trial court to admit evidence relating to his cultivation of marijuana. As noted above, the State introduced evidence that the appellant's motive for attacking Mr. Caldwell was the appellant's belief that Mr. Caldwell had stolen some of his marijuana. The appellant now claims that the State failed to produce extrinsic evidence of the marijuana patch and that the trial court failed to hold the mandatory in camera hearing to determine by a preponderance of the evidence that the marijuana cultivation by the appellant actually occurred.

* * *

Upon application of these rules to the facts of this case, we conclude that the evidence complained of was

62

properly admitted into evidence by the trial court.  The trial court held a pre-trial hearing in which it discussed the admission of the evidence of marijuana cultivation.  The trial court then entered an order in which it granted the State's motion to permit the introduction of the evidence.  At both the hearing and in its order, the trial court found that the evidence was relevant on the issue of motive, and that its probative value outweighed any prejudicial effect.

Although the trial court did not specifically state at the hearing or in its order that the appellant's marijuana cultivation was supported by a preponderance of the evidence, the record shows that there was sufficient evidence to support the introduction of the evidence.  At trial, Mr. Starkey testified that as he and Mr. Caldwell were beaten, Mr. Mosley and the appellant "said we just stole their pot."  Mr. White testified that he heard a conversation between Mr. Mosley and the appellant in which they mentioned that "[t]hey grew dope up in the hollow," and "[t]hey said it was the best they ever did." Finally, Mr. Mosley testified that prior to the attacks on the victims, the appellant talked about "whipping their ass for stealing our weed," and that there was marijuana up the hollow that belonged to him and the appellant.  He further testified that he pled guilty to the cultivation of marijuana.  Contrary to the appellant's assertion, having produced sufficient evidence of the marijuana cultivation through testimony, the State was not required to introduce physical evidence of the existence of a marijuana patch.

The record also indicates that the trial court properly instructed the jury with regard to the evidence of marijuana cultivation.  At the end of Mr. Starkey's, Mr. White's and Mr. Mosley's testimony as well as in its final instructions to the jury, the trial court instructed the jury that the evidence of marijuana cultivation was admitted only to show the motive of the appellant in connection with the offenses of murder and malicious assault and to show whether there was preparation and planning in connection with the offense of conspiracy with which the appellant was charged.

Finally, we find that the circuit court's ruling that evidence of marijuana cultivation was relevant to show the appellant's motive for the crime of murder and that the probative value of the evidence outweighed its

prejudicial effect to be proper under our law. Accordingly, we conclude that the trial court substantially complied with Rule 404(b) and our case law in admitting evidence of marijuana cultivation. Therefore, the circuit court did not err in denying relief to the appellant on the ground that the evidence was improperly admitted.

700 S.E.2d at 502-504.

The SCAWV further found that the evidence of marijuana cultivation was properly admitted as *res gestae* of the crime. The court stated in pertinent part:

In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." See United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990): "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits in to the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae* – as part and parcel of the proof charged in the indictment. See United States v. Masters, 622 F.2d 83, 86 (4th Cir. 1980)(stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is... appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae"'"). [Citations omitted]. State v. LaRock, 470 S.E.2d 613, 631 n.29 (W. Va. 1996).

In the instant case, Mr. Mosley testified that he and the appellant planned to attack Mr. Starkey and Mr. Caldwell because of their belief that Mr. Starkey and Mr. Caldwell stole some of their marijuana. This evidence is inextricably intertwined with the offense of murder because it indicates the appellant's motive for the murder. Further, the marijuana evidence is crucial to explaining the sequence of events immediately prior to the attack on the victims. Thus, the evidence is necessary to provide context and to complete the story of

64

the crime.

700 S.E.2d at 504.

Not only has Petitioner not demonstrated that the admission of the evidence concerning marijuana cultivation was fundamentally unfair, he has not even demonstrated that it was improper under West Virginia law. The SCAWV found that the there was a sufficient basis for admission of the testimony concerning marijuana cultivation, that it met the exceptions under Rule 404(b) of the West Virginia Rules of Evidence, that the probative value of the evidence outweighed the prejudicial effect, and that, at any rate, the evidence was *res gestae* of the crimes with which Petitioner was charged. This is solely a matter of state evidentiary law.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has asserted a claim that is not cognizable in federal habeas corpus, that the state courts' findings on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Two of Petitioner's section 2254 petition.

**C. Ground Three - Prosecutorial misconduct.**

In Ground Three of his section 2254 petition, Petitioner alleges that the prosecutor's remarks in closing argument were misleading and prejudicial, and violated his right to a fair trial. The petition further asserts:

It is undisputed that Petitioner was never charged with cultivation of marijuana. It is also undisputed that the trial court failed to conduct an *in camera* hearing to determine by a preponderance of the evidence that a marijuana field was ever even cultivated or that this act occurred or that it was committed by either Petitioner or his co-defendant, Hank Mosley. The only evidence of this act is a guilty plea entered by Mosley three days before Petitioner's trial commenced, and which resulted in the dismissal of the murder charge against Mosley in exchange for his testimony against Petitioner. However, the trial court, in its colloquy with Mosley when accepting Mosley's guilty plea to cultivation of marijuana, contrary to West Virginia State Law, did not require Mosley to state a factual basis on the record for a charge of cultivation of marijuana. Nor did Mosley's testimony at Petitioner's trial extract evidence of this marijuana field. (T. Tr. 4, Day 3, pp. 42-82.)

Yet, the State repeatedly referred to and made improper prejudicial use of the uncharged misconduct during closing arguments to the jury. By pronouncing Petitioner guilty of the felony crime of cultivation of marijuana, an uncharged act, the State succeeded in improperly prejudicing the jury against Petitioner. The State also improperly called into question Petitioner's character with the proclamation of Petitioner's guilt for the cultivation of marijuana. From the specific context of the prosecutor's comments to the jury, he was not merely referring to motive, deliberation or preparation of the alleged crime. Instead, he was using the inflammatory statements to reintroduce and reinforce the specter of drug cultivation and usage to hammer home that Petitioner was a criminal and a felon. (T. Tr. 5, Day 4, pp. 31-44, 48-67.)

(ECF No. 3 at 35-36).

Respondent's Memorandum of Law contends that the prosecutor "did not tell the jury Petitioner was convicted of a felony." (ECF No. 16 at 35). Rather, Respondent asserts, "the prosecutor correctly pointed out that '*anyone* who is guilty of the crime of cultivation of marijuana, a felony, is[n't] going to call the

police and say, hey, somebody's stealing my dope[.]'" (Resp't Ex.
16 at 47.)  (<u>Id.</u>)  Respondent further asserts that:

> The prosecutor's statements were not meant to inflame the
> jury but to address the absurdity of a drug dealer
> calling police to report a theft of a substance that is
> a felony to cultivate.   Moreover,  the  trial  court
> instructed the jury during the introduction of evidence
> of Petitioner's cultivation of marijuana that it was
> unrelated and not the subject of the proceedings.
> (Resp't Ex. 14 ay 92.)

(<u>Id.</u>)  Respondent contends that Petitioner has not demonstrated
that the SCAWV misapplied federal law in holding that Petitioner
was entitled to no relief on this claim.  (<u>Id.</u>)

Habeas relief is only warranted if a prosecutor's remarks
rendered the trial fundamentally unfair.  The United States Supreme
Court has held that "a criminal conviction is not to be lightly
overturned on the basis of a prosecutor's comments standing alone,
for the statements or conduct must be viewed in context; only by so
doing can it be determined whether prosecutor's conduct affected
fairness of the trial."  <u>United States v. Young</u>, 470 U.S. 1, 11
(1985).  In fact, courts have applied what has come to be known as
the "invited response" or "invited reply" rule, whereby courts look
at the remarks within the context of the entire trial to determine
whether  the prosecutor's behavior amounted to prejudicial error.
<u>Id.</u> at 12.

"Prosecutorial misconduct may warrant habeas relief only if
the relevant misstatements were so egregious as to render the
entire trial fundamentally unfair to a degree tantamount to a due

67

process deprivation." <u>Caldwell v. Russell</u>, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), <u>abrogated on other grounds</u>, <u>Mackey v. Dutton</u>, 217 F.3d 399, 406 (6th Cir. 2000); <u>see also</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).

The SCAWV found as follows concerning this claim:

The appellant next alleges error by the circuit court in failing to grant the appellant relief based on allegedly misleading and prejudicial remarks made by the prosecutor during his closing argument. According to the appellant, the trial court should have instructed the jury to disregard the prosecutor's remarks.

In his closing argument, the prosecutor commented on testimony that the appellant wanted to call the police on Mr. Starkey and Mr. Caldwell instead of attack them. The prosecutor stated:

There was some mention made with regard to calling the police with regard to someone stealing pot. Do we really believe that anyone who is guilty of the crime of cultivation of marijuana, a felony, is going to call the police and say, hey, somebody's stealing my dope? The State would submit to you that is not within the realm of possibility.

The appellant contends that these comments were designed to mislead the jury because the appellant was never charged with or convicted of the felony of marijuana cultivation. The appellant further argues that the trial court's failure to take curative measures to correct the prosecutor's improper remarks prejudiced the appellant.

700 S.E.2d at 505.  The SCAWV then cited to state case law setting

forth four factors that must be considered in determining whether

remarks in closing argument require reversal:

> Four factors are taken into account in determining
> whether improper prosecutorial comment is so damaging as
> to require reversal: (1) the degree to which the
> prosecutor's remarks have a tendency to mislead the jury
> and to prejudice the accused; (2) whether the remarks
> were isolated or extensive; (3) absent the remarks, the
> strength of competent proof introduced to establish the
> guilt of the accused; and (4) whether the comments were
> deliberately placed before the jury to divert attention
> to extraneous matters.

Syllabus Point 6, <u>State v. Sugg</u>, 456 S.E.2d 469 (1995).  <u>Id.</u>  The

SCAWV further found:

> Application of these factors to the instant case
> leads this Court to concluded [sic; conclude] that the
> prosecutor's comment, even if improper, was harmless.
> First, the prosecutor did not say that the appellant had
> been convicted of the felony of marijuana cultivation and
> it is unlikely that the jury understood the comment as
> such.  Instead, the jury would have understood the
> comment as a reference to the appellant's marijuana
> cultivation, a fact which had been testified to by three
> witnesses. Second, the prosecutor's remark was isolated.
> Third, absent the prosecutor's remark, there was more
> than sufficient evidence to establish the appellant's
> guilt.  Finally, the comment was not deliberately placed
> before the jury to divert attention to extraneous matters
> [footnote omitted].    Instead, the prosecutor was
> addressing the absurdity of a claim that the appellant
> wanted to call the police on Mr. Starkey and Mr. Caldwell
> for stealing from his and Mr. Mosley's marijuana patch
> [footnote omitted].

<u>Id.</u> at 505-506.

Given that the evidence was sufficient to find Petitioner

guilty of the crimes with which he was charged and viewing the

argument in the context of the entire proceedings, such comments

did not infect the trial with unfairness or deny Petitioner due process. See Buell v. Mitchell, 274 F.3d 337, 364-65 (6th Cir. 2001); Kinder v. Bowersox, 272 F.3d 532 (8th Cir. 2001); Sublett v. Dormire, 217 F.3d 598 (8th Cir. 2000); United States v. Sanchez-Sotelo, 8 F.3d 202, 211 (5th Cir. 1993); Simmons v. Bowersox, 235 F.3d 1124, 1136-37 (8th Cir. 2001).

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's rights to due process and a fair trial were not violated by the prosecutor's comments in closing argument. The court further proposes that the presiding District Judge **FIND** that the state courts' decisions were not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or based upon an unreasonable determination of the facts as set forth in the record, and that Respondent is entitled to judgment as a matter of law on Ground Three of Petitioner's section 2254 petition.

D. **Ground Four - Biased juror claims.**

In Ground Four of his section 2254 petition, Petitioner contends that he was denied the right to a fair and impartial jury because the trial court refused to strike for cause two potential jurors who had ties to the prosecutor. (ECF No. 3 at 38-39). The petition elaborates as follows:

> The trial court committed error when it failed to disqualify for cause, despite individualized *voir dire*, prospective juror Carol Melton ("Melton"), a neighbor and

70

personal friend of the state's prosecutor, Jerry White, who also served as her son's ball coach; and Annie Hall ("Hall"), a relative by marriage to Benny Adkins, the prosecutor's investigator who was present at counsel table throughout Petitioner's trial and who assisted with the investigation of the case. Petitioner was forced to utilize two peremptory challenges to remove these two jurors from the panel.

The state habeas court, in its Order denying state habeas corpus relief, ruled that "[t]he trial court did not abuse its discretion in not striking jurors for cause after making inquiry of the jurors that they could render an impartial decision . . . ." (Appendix A.)

The trial court refused to grant defense counsel's motion to strike for cause prospective jurors Melton and Hall. (T. Tr. 2, Day 1, pp. 101-103, 117-120.) Defense counsel's first objection arose when she learned that Hall was related to Benny Adkins, the prosecutor's investigator during general *voir dire*. (T. Tr. 2, Day 1, p. 51.) Although later in individualized *voir dire* Hall stated she believed she could fairly hear the evidence and act as a fair and impartial juror. (Id. at 117-19), defense counsel raised a motion to strike.

Melton was questioned more extensively by the trial court when she disclosed that the prosecutor, Jerry White, represented her with a legal matter on her house, and that their families (White's and Melton's) had a personal relationship because they were next door neighbors and White was her son's ball coach. (T. Tr. 2, Day 1, pp. 56-58, 101.)

State's attorney, Mr. White, subsequently acknowledged, out of Melton's presence, that she was a friend and he would not object if the court excused her but believed she was sincere. (T. Tr. 2, Day 1, pp. 101-03.) Based on these representations, the trial court overruled defense counsel's motion to strike Melton for cause. Id. Because the trial court failed to strike for cause these two jurors, Hall and Melton, defense counsel was forced to exercise two of her six peremptory strikes.

The [SCAWV] ruled that a trial court's failure to strike potential jurors for cause does not rise to the level of a constitutional violation but is merely ordinary trial error. The reviewing court fails to

> acknowledge the inadequate appeals process in West
> Virginia in that this issue was raised in Petitioner's
> petition for direct appeal and the [SCAWV] refused to
> review.  Allowing two such potentially biased jurors to
> remain on the panel tainted the entire panel.  Petitioner
> was not able to proceed to trial with a jury of twelve
> free from all possible bias.

(Id. at 38-39).

Respondent's Memorandum of Law addresses this claim as

follows:

> Petitioner argues the trial court erred by refusing
> to dismiss two jurors for cause who had ties to the
> prosecutor, even though neither challenged juror actual
> sic; actually] sat for the trial but were instead
> dismissed using the peremptory strikes of the defense.

(ECF No. 16 at 35).  Respondent then cites to the SCAWV's findings

concerning this claim:

> The appellant propounds in his next assignment of
> error that the circuit court erred in denying habeas
> relief based on the trial court's refusal to disqualify
> two jurors with strong ties to the prosecutor.  The
> record below indicates that prospective juror Carol
> Melton was a neighbor and friend of the prosecutor.
> Also, the prosecutor was the coach of Ms. Melton's son's
> sports team and provided legal assistance to Ms. Melton
> in the purchase of her home.  Prospective juror Annie
> Hall was related by marriage to Benny Adkins, the
> prosecutor's investigator who sat at the prosecutor's
> table throughout the appellant's trial.  After the trial
> court denied counsel's motion to excuse the jurors for
> cause, counsel used peremptory challenges to remove the
> two jurors.  The appellant now contends that as a result
> of the two prospective juror's relationships with the
> prosecutor or his employee, the prospective jurors should
> have been removed for cause.
>
> This Court finds that the circuit court did not err
> in denying habeas relief to the appellant based on the
> trial court's failure to remove the two challenged
> prospective jurors for cause.  With regard to cognizable
> habeas corpus claims, this Court has held that "[a]

72

> habeas corpus proceeding is not a substitute for a writ
> of error in that ordinary trial error not involving
> constitutional violations will not be reviewed."
> Syllabus Point 4, <u>State ex rel. McMannis v. Mohn</u>, 163 W.
> Va. 129, 254 S.E.2d 805 (1979). We conclude that any
> error in failing to disqualify the complained of
> prospective jurors for cause amounts to ordinary trial
> error and is not of constitutional magnitude.

700 S.E.2d at 506. While the SCAWV did recognize that the right to

a trial by a fair and impartial jury is a fundamental right, the

court further held that:

> [B]ecause the prospective jurors at issue did not sit on
> the appellant's jury, the appellant is unable to show
> that the jury in his trial was not impartial and
> objective. The most that the appellant can show is a
> violation of his right to a jury panel of twenty jurors
> free from exception under W. Va. Code § 62-3-3 (1949)
> [footnote omitted]. But as this Court explained in <u>State
> v. Phillips</u>, 194 W. Va. 569, 461 S.E.2d 75 (1995), a
> violation of W. Va. Code § 62-3-3 is not constitutional
> error.
>
> The mere presence of a biased prospective juror on
> a jury panel, although undesirable, does not threaten a
> defendant's constitutional right to an impartial jury if
> the biased panel member does not actually serve on the
> jury that convicts the defendant. Although a defendant
> may be forced to use a peremptory challenge to remove a
> juror that should have been removed for cause [that] does
> not alone invalidate the fact that the juror was thereby
> removed from the jury as effectively as if the trial
> court had excused him for cause. Peremptory challenges
> are merely a means of achieving an impartial jury. They
> are neither mandated by the United States Constitution or
> the West Virginia Constitution nor of constitutional
> dimension and we will not permit the loss of a peremptory
> challenge ti establish the breach of a constitutional
> guarantee in this context.
>
> * * *
>
> In the instant case, the prospective jurors
> complained of did not serve on the jury that convicted
> the appellant. As a result, the appellant is unable to

73

> show a violation under the state and federal
> constitutions. Accordingly, we find that the circuit
> court did not err in failing to grant habeas relief to
> the appellant based on the presence of prospective jurors
> Melton and Hall on the jury panel [footnote omitted].

Id. at 506-507.

The Supreme Court has held that the failure to remove a juror for cause, with the result that the defendant had to use a peremptory challenge to remove the potential juror, does not violate the defendant's right to an impartial jury. United States v. Martinez-Salazar, 528 U.S. 304 (2000); see also Ross v. Oklahoma, 487 U.S. 81 (1988). Thus, as noted by Respondent, Petitioner has not raised a cognizable federal constitutional claim on this basis. (ECF No. 16 at 37).

Because Ms. Melton and Ms. Hall were removed from the jury panel by peremptory challenges, Petitioner cannot demonstrate a violation of his constitutional rights based upon this claim. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Four of Petitioner's section 2254 petition.

**E.   Ground Five - Cumulative Error.**

In Ground Five of his section 2254 petition, Petitioner claims that his due process rights were violated by the cumulative effect

of state trial errors.  (ECF No. 3 at 40-41).  His petition states:

> The criminal trial record is replete with individual
> instances of trial error that violated Petitioner's
> constitutional rights to a fair trial and resulted in
> cumulative error that was fatal to its outcome.  These
> errors include, but are not limited to, the following:
> The trial court's failure to follow procedures for
> admitting prior bad acts of the accused; The trial court
> allowed the testimony of Petitioner's co-defendant, Hank
> Mosley, to be introduced regarding his guilty plea to
> cultivation of marijuana even though Petitioner had never
> been charged with the crime and then compounded the error
> by giving a confusing and cautionary instruction that
> mislead the jury; The trial court compounded that error
> by failing to chastise the prosecutor when he made
> improper remarks in his closing argument, referring to
> the uncharged conduct of Petitioner as a "felony" and
> referring to him as "guilty" in an effort to inflame the
> jury; The trial court failed to take any measures to
> admonish the jury or issue some curative measure; The
> trial court forced defense counsel to use two peremptory
> strikes when it failed to dismiss two jurors for cause
> who had arguably close relationships with the prosecutor
> and his investigator.  Finally, these errors were
> compounded by defense counsel's ineffective assistance at
> all critical stages, resulting in Petitioner's conviction
> for first degree murder without a recommendation of
> mercy.  Arguments in support of these claims have been
> set forth fully herein but had Ms. Codispoti given an
> opening statement, called character witnesses, after she
> advised Petitioner not to take the stand in his own
> defense, when she knew that Petitioner had no criminal
> record and was raising a little girl or otherwise
> developed a credible and consistent defense and offered
> evidence to mitigate his sentence on the issue of mercy,
> the outcome would have been different.

(Id.)

Respondent's Memorandum of Law contends that, without a

showing of constitutional error, there can be no cumulative error.

(ECF No. 16 at 37-38).  Respondent asserts that:

> Petitioner does not explain how these trial errors
> individually or cumulatively deprived him of a federally

guaranteed right, nor does he cite any United States Supreme Court decisions holding that cumulative trial errors which have not been shown to have had a 'substantial and injurious effect or influence in determining the jury's verdict [FN 3] can form any basis for federal habeas relief."

[FN 3 - Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946))]

(Id. at 38).

As noted by Respondent, in Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error . . . ." Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.

Petitioner's claim of cumulative error stems from claims which the undersigned believes to be non-errors. To the extent that Petitioner raises cumulative error claims already addressed herein, those claims lack merit as well.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by Petitioner in his federal petition, and that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground

76

Five of Petitioner's section 2254 petition.

     **F.    Petitioner's other grounds for relief.**

     In Ground Six of his section 2254 petition, Petitioner alleges that his Sixth Amendment rights to an impartial jury and the effective assistance of counsel, and his Fourteenth Amendment right to a fair trial were violated because West Virginia law does not allow a trial court to instruct a jury on what factors it may consider in determining whether to recommend mercy in first degree murder cases.  (ECF No. 3 at 41-44).  In Ground Seven of his section 2254 petition, Petitioner contends that there was insufficient evidence to convict Petitioner of first degree murder. (<u>Id.</u> at 45).  In Ground Eight of his section 2254 petition, Petitioner asserts that the trial court's instruction to the jury that malice may be inferred by the use of a deadly weapon impermissibly shifted the burden of proof to the defendant.  (<u>Id.</u> at 46-47).

     Respondent contends that Petitioner did not properly exhaust these claims, as they are plead, in the state courts.  Respondent states, "Grounds six, seven and eight of the present petition were not raised in either Petitioner's direct appeal or appeal of the denial of habeas relief such that they are exhausted for purposes of review in federal habeas corpus."  (ECF No. 16 at 38).  Respondent then cites the pertinent provision of section 2254 concerning exhaustion, and the exhaustion procedures available in

West Virginia:

> Section 2254 of Title 28 provides, in pertinent part: (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> > (A) the applicant has exhausted the remedies available in the courts of the State . . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. §§ 2254(b)(1)(A), (c).

The petitioner bears the burden of proving exhaustion. <u>See</u> <u>Breard v. Pruett</u>, 134 F.3d 615, 619 (4th Cir. 1998); <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997).  Where a petitioner has failed to exhaust his state court remedies, the federal petition should be dismissed.  <u>McDaniel v. Holland</u>, 631 F. Supp. 1544, 1545 (S.D. W. Va. 1986)(citing <u>Preiser v. Rodriquez</u>, 411 U.S. 475, 477 (1973)).

In West Virginia, prisoners may exhaust their available state court remedies either by stating cognizable federal constitutional claims in a direct appeal, or by stating such claims in a petition for a writ of habeas corpus in a state circuit court pursuant to West Virginia Code § 53-4A-1, followed by filing a petition for appeal from an adverse ruling in the SCAWV.  <u>Moore v. Kirby</u>, 879 F. Supp. 592, 593 (S.D. W. Va. 1995); <u>McDaniel v. Holland</u>, 631 F. Supp. at 1545.  A prisoner may also exhaust the State court

78

remedies by filing a petition for a writ of habeas corpus filed under the original jurisdiction of the SCAWV. However, an original jurisdiction petition that is denied without an indication that the denial is with prejudice following a determination on the merits will not exhaust the prisoner's State court remedies. See Moore, 879 F. Supp. at 593; McDaniel, 631 F. Supp. at 1546; see also, Meadows v. Legursky, 904 F.2d 903, 908-909 (4th Cir. 1990)(abrogated on other grounds, Trest v. Cain, 522 U.S. 87 (1997)). (ECF No. 16 at 38-39).

Respondent contends that Grounds Six, Seven and Eight were not raised in the state courts in a manner that satisfies the exhaustion requirement. (Id. at 40). He then addresses each of those claims individually. Concerning Ground Six, Respondent states:

> In ground six, Petitioner claims that the West Virginia Supreme Court of Appeals erroneously denied his petition for reconsideration by not "revisit[ing] their ruling that the jury would not have made a recommendation for mercy even in the absence of trial counsel's performance and that petitioner was not, thereby prejudiced." (Petition at 42.) Petitioner further argues that the "Court's determination was misplaced inasmuch as the Court failed to consider it is impossible for meaningful appellate review in West Virginia because juries are not instructed on what factors to consider when deliberating whether to recommend mercy in the first degree murder cases." (Id.)

> Aside from the absence of a federal issue in this claim, Petitioner appears to be challenging the [SCAWV's] denial of his motion for reconsideration in light of its determination that trial counsel was not ineffective for failing to argue mercy. A challenge to the findings of the State's highest court cannot be exhausted and it also

amounts to a challenge to a post-conviction proceeding which cannot form the basis for habeas relief. <u>See</u>, <i>e.g.</i>, <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987) (There is no constitutional right to post conviction relief). Although Petitioner's claims of ineffective assistance of counsel were exhausted, Petitioner challenges the determination of the West Virginia Supreme Court in denying relief and that cannot form the basis for a separate claim. Therefore, this claim is barred from consideration in federal habeas corpus because Petitioner has no available remedies to properly raise it in state court. Moreover, the underlying issue has been raised, addressed and denied.

(<u>Id.</u> at 40-41).

Turning to Ground Seven, Respondent asserts:

In ground seven, Petitioner claims there was insufficient evidence to sustain the verdict of first degree murder. This claim, as argued in the context of a sufficiency of evidence claim, was not raised in either Petitioner's direct appeal or habeas appeal and is not exhausted. Although Petitioner argued that the trial court erred in denying the defense's motion for judgment of acquittal, and also argued that the trial court erred in not instructing the jury on lesser included offenses of manslaughter and second degree murder, Petitioner never argued that there was insufficient evidence to sustain the verdict within the meaning of the controlling authority on this issue, <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). Rather, Petitioner challenged a trial court ruling within the context of a state law claim challenging jury instructions. Moreover, Petitioner's argument on this point in his direct appeal was cursory at best and certainly was not sufficient to alert the state court to the real possibility that a constitutional violation had occurred. (<u>See</u> <u>Pitchess [v. Davis</u>, 421 U.S. 482 (1975)].) Simply claiming that a trial court should have granted a judgment of acquittal in spite of overwhelming record evidence of guilt is not sufficient to present a legitimate federal issue to the state courts. (<u>See</u> Resp't Ex. 4 at R.324.) As such, this claim was not presented to the state courts in the proper federal context to render it exhausted for purposes of review in federal habeas corpus.

(<u>Id.</u> at 41).

The undersigned notes that, in the section of Petitioner's direct appeal addressing the denial of Petitioner's motion for a judgment of acquittal, a blanket statement that there would be insufficient evidence to sustain a conviction is made. (ECF No. 15, Ex. 4 at 11). However, there is no further support for this claim, or even an indication as to which of Petitioner's charges this claim was directed.

Petitioner also raised a sufficiency of evidence claim in his initial habeas corpus petition, but it was not included in his supplemental petition, and no specific findings were made thereon by the state courts. Furthermore, Petitioner did not raise this claim in his habeas appeal. Accordingly, the sufficiency of the evidence claim, as raised in Petitioner's section 2254 petition, is arguably unexhausted.[3]

Finally, concerning Ground Eight, Respondent asserts:

> In ground eight, Petitioner claims that the court's instruction to the jury that malice could be inferred by the use of a deadly weapon, operated to illegally shift the burden of proof to the defense. Petitioner raised no claim in state court regarding impermissible burden shifting instructions. Although Petitioner raised several state law challenges to instructions both given and refused at trial, Petitioner never argued the

---

[3]   Given the overwhelming evidence to support a finding of Petitioner's guilt, and viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979). Accordingly, it is unlikely that Petitioner could succeed with this claim, even if it is deemed to be exhausted.

> violation of any federally guaranteed constitutional right within the context of controlling federal authority flowing from jury instructions. Moreover, Petitioner's argument in support of this claim amounts to no more than conclusory allegations with no supporting legal premise.

(Id. at 41-42).

Respondent contends that Petitioner had a full round of proceedings in state court, including omnibus hearings and a finding on the merits of his claims raised therein, followed by a full review by the SCAWV of his grounds for habeas relief. Respondent maintains that Petitioner "has no further available state court remedy and therefore is unable to exhaust these claims. Therefore, grounds six, seven and eight of the instant petition are barred from review by this Court." (Id. at 42).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner did not raise the claims as pled in Grounds Six, Seven and Eight either in his direct appeal or in both his state habeas corpus petition and the appeal therefrom. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner has failed to properly exhaust these claims and, thus, these claims are barred from review by this court, and should be dismissed with prejudice.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (ECF No. 15), **DENY** Petitioner's Petition for a

Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 3), and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

_____September 2, 2011_____                    _Mary E. Stanley_____
           Date                                     Mary E. Stanley
                                                    United States Magistrate Judge